B/O

**FILED**

1  Name: Jethro Hackworth

2  Address: 9320 Mines Ave

3  Pico Rivera CA 90660

4  Phone: 562-584-4651

5  Fax: n/a

6  In Pro Per Jethro Hackworth

7

**2024 JAN -4  PM 12: 56**

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY_____

8  **UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

9

10  Jethro Hackworth

CASE NUMBER:

8:24-cv-00025-CBM(DFMx)

11

12  Plaintiff

13  v.

14  Blizzard Entertainment

15  Defendant(s).

Complaint
(Enter document title in the space provided above)

16

17  Itellecual property theft.

18

19  Copyright Theft

20

21  World of Warcraft Servers

22

23  Hard-Core Servers

24

25  See attachments

26

27

28

01/04/2024

Page Number

CV-127 (09/09)        PLEADING PAGE FOR A SUBSEQUENT DOCUMENT

# JETHRO HACKWORTH VS BLIZZARD ENTERTAINMENT

Trade secret law prohibits the unauthorized disclosure of any confidential and proprietary information, such as a formula, device, or

Page 3 of REPORTING INTELLECTUAL PROPERTY CRIME

## INTELLECTUAL PROPERTY THEFT

A trade secret can be surreptitiously misappropriated from its owner either by a company insider or by someone outside a company and used to benefit the thief, a competitor, or other third party.

Page 3 of REPORTING INTELLECTUAL PROPERTY CRIME

# STATEMENT OF REASON

**The product Hard-Core World of Warcraft Servers was originally my, Jethro J. Hackworth's, design.**

**The intellectual property consisted of losing items upon death and different leveling attributes.**

# ACTION TO PROTECT THE STOLEN PROPERTY

**Noticing people had been tampering in my personal property such as electronics, one day I**

# EVIDENCE OF THE POLICE REPORT



# EVIDENCE WITHIN THE POLICE REPORT

Notepad goes here when received by subpoena

# EVIDENCE WITHIN THE POLICE REPORT

Transcript information goes here when received by subpoena

EVIDENCE WITHIN THE PUBLISHED BOOK

  https://read.amazon.com/?asin=B09GB8LCL7&_encoding=UTF8&ref=dbs_p_ebk_r00_pbcb_rnvc00

THE DAY THE UNITED STATES BETRAYED ME

the fraud and steal from me and make his reports look better to his upper management. I am not sure if this was happening to the other employees, but I made a police report where they said they will not investigate this.

I contacted a previous manager in question of the situation from Bio-Rad. He had offered a spot, but something said to stay and continue to watch what these people at Talend were doing even though I truly enjoyed my time working at Bio-Rad. Someone broke my phone screen as I left it charging when I went to the bathroom. When I came back, I didn't notice but the person sitting next to me stood up and loudly stated, "what happened to your phone?". So, someone broke the screen on my phone, and they wanted to let me know. This is when I knew the damages were intentional and coming from within the office.

## Cyber Attacks

There were cyber-attacks on my home devices, going through my computer and looking at my files on monitoring what I was doing on my home machines. I received DOS attacks which are meant to slow down or completely disconnect you from the network. I found them hacking into my bank accounts as I found an Apple MACOSX computer connected and monitoring my bank account which I reported to the Chase bank and the police as well. Talend started changing or attempting to twist what was

taught into something opposite of what we were taught, basically taking the training, and then telling me I was wrong from what the training said which started to tell me they were up to no good.

## Drugged



I was drugged or some sort of chemical food tampering this day was April 20th 2018 and they went to get food and brought back Brussel sprouts. Inside of these was something where I started to feel awkward and a weird sensation in my feet and back/neck area causing me to feel some pain.

# EVIDENCE WITHIN THE POLICE REPORT

Body Camera video inserted here with audio whe

# CLAUSE FOR INTELLECTUAL THEFT

**I published the report into a book in 2021. This would be a clause for copyright whomeve**

# PROOF OF PUBLICATION AND COPYRIGHTS

**The Copyright I hold is through the Amazon Bookstore.**
**The Day the United States Betrayed Me**
**Kindle Edition Publication date**
**14 September 2021**
**by Jethro Hackworth (Author) Format: Kindle Edition**

**https://www.amazon.com.au/Day-United-States-Betrayed-Me-ebook/dp/B09GB8LCL7**

**ASIN  :  B09GB8LCL7**

# PROOF OF PUBLICATION AND COPYRIGHTS

**Get In and Get Going: Classic Hardcore**
**Blizzard Entertainment**
**August 7th 2023**
**Whether new to World of Warcraft or returning to Azeroth, we'll get you ready to take o**
**https://news.blizzard.com/en-us/world-of-warcraft/23988130/get-in-and-get-going-classic**

# COPYRIGHT CAN BE A FEDERAL CRIME

When does Copyright become a federal crime?

"17 U.S.C. § 506(a) and 18 U.S.C. § 2319 where a defendant willfully reproduces or distri least ten copies of one or more copyrighted works with a total retail value of more than $2,500 within a 180-day period."

https://www.justice.gov/criminal-ccips/file/891011/download

# LENGTH OF COPYRIGHT PROTECTION

**The length of copyright protection depends on when a work was created. Under the current law, w**

**https://www.copyright.gov/what-is-copyright/**

# COPYRIGHT EMPHASIS IN THOUGHT

**This intellectual property was more than just a title or a phrase, but an idea with details embedded**

REJECTED BY BLIZZARD ENTERTAINMENT

**To make the point, it would have been something I would have loved to have played, but the fact th**

REJECTED BY BLIZZARD ENTERTAINMENT

**To make the point, it would have been something I would have loved to have played, but the fact th**

# QUEST DESIGNER APPLICATION

**The position was the Quest Designer. They could have just hired me and I would have given it to t**

# EVIDENCE QUEST DESIGNER APPLICATION

# REASON FOR FEDERAL COURT

**The fact they felt the need to reject my application, and steal my intellectual property.**

# JUSTIFICATION OF THE PRICE

I AM REQUESTING

$20,000,000

# JUSTIFICATION OF THE PRICE

[https://www.msn.com/en](https://www.msn.com/en)-ph/news/technology/world-of-warcraft-classic-hardcore-week-one-Statistics-reveal-most-Deadly-enemies/ar-AA1gbJRp



**World of Warcraft Classic Hardcore Week One Statistics Reveal Most Deadly Enemies**

Story by Eric Law • 3mo

World of Warcraft Classic Hardcore Week One Statistics Reveal Most Deadly Enemies
© Provided by GameRant

- World of Warcraft Classic Hardcore has proven to be a brutal one-life experience, with nearly 100,000 characters dying within the first day.
- The top causes of death for Hardcore players include Kobold Miners, Wendigos, falling damage, PvP, and

# JUSTIFICATION OF THE PRICE

**How Many People Play World of Warcraft?**

**We estimate the daily player count of World of Warcraft to be 2,536,018, with a total player base of 1**

**https://mmo-population.com/r/wow**

**About one fourth of the population play on the hard-core servers: 33,368,656**

# JUSTIFICATION OF THE PRICE

**How am I justifying $20,000,000?**

- **The game is a subscription game, which means each person pays $15, per month, every month.**

- **The public statistics show they probably have around 33,368,656 players on hardcore servers alone**

- **That would be $500,529,840 a month, and $6,006,358,080 a year**

- **From my intellectual property. I would state that an idea generating $6,006,358,080 a year which wa**

- **gifting me $20,000,000 would be a fair deal since it was stolen**

# JUSTIFICATION OF THE PRICE

- **The price goes up when something is stolen**

- **Think, in just ten more years that is $60,063,580,800 dollars from my intellectual property**

- **As the World of Warcraft population continues to steadily populate**

# JUSTIFICATION OF THE PRICE

- This doesn't include the earnings from new players purchasing the game

- which costs at a one time payment of $79.99 per player

- Let's say they gain 150 new players per month, for the next ten years, that's an additional $1,439,82

- That's $60,063,580,800 in ten years

- The amount blizzard is making from this could be double or more without seeing private earnings

# JUSTIFICATION OF THE PRICE

- This doesn't include the earnings from new players purchasing the game

- which costs at a one time payment of **$79.99** per player

- Let's say they gain 150 new players per month, for the next ten years, that's an additional $1,439,82

- That's $60,063,580,800 in ten years

# JUSTIFICATION OF THE PRICE

That is now $60,063,580,800 in ten years.

Asking only $20,000,000 for stolen property
and a rejected job applicant is generous from the victim,

Jethro Hackworth

# The Day the United States Betrayed Me



*For countless years, the country of the United States allowed me to become an experiment and target for countless crimes. The United States ignored my pleads*

*for assistance in truth. I sent help requests to a large portion of the world, most of the responses were left in the statements, we cannot and will not help or suggested to leave the United States.*

# Contents

Chapter 1: Talend......................................................................................................................5

    Hired..................................................................................................................................5

    Day one.............................................................................................................................5

    Monitoring.........................................................................................................................5

    Work..................................................................................................................................5

    Devices..............................................................................................................................5

    Fraud.................................................................................................................................6

    Cyber Attacks....................................................................................................................6

    Drugged.............................................................................................................................7

Chapter 2: Around the living area in Irvine, California..................................................................8

    Car Broken Into.................................................................................................................8

    Attempted Murder...........................................................................................................10

    Home Breakins.................................................................................................................10

    Account Hacks.................................................................................................................10

    Weird Stalker..................................................................................................................10

    Recording Stalker............................................................................................................10

    Hit by SUV......................................................................................................................11

Chapter 3: Santa Ana, California..............................................................................................12

    Towing.............................................................................................................................12

    Smoke..............................................................................................................................12

    Gym.................................................................................................................................12

    Organized Strike..............................................................................................................12

    Shady grading..................................................................................................................12

    Mental Institution............................................................................................................13

    Weird Guy.......................................................................................................................13

    Station Supervisor...........................................................................................................13

Chapter 4: Humanity...............................................................................................................14

    Homeless Crisis...............................................................................................................14

Human Rights Report..................................................................................................................14

Chapter 5: School..........................................................................................................................16

Chapter 6: Government Agencies..................................................................................................17

Legal...........................................................................................................................................17

FBI...............................................................................................................................................17

CIA & NSA...................................................................................................................................17

Military.......................................................................................................................................17

News...........................................................................................................................................17

United Nations...........................................................................................................................17

DHS.............................................................................................................................................17

Government Officials..................................................................................................................18

Kamala Harris.............................................................................................................................18

Other Countries.........................................................................................................................18

The White House........................................................................................................................19

Suicide Rate...............................................................................................................................19

Chapter 7: Vanguard University....................................................................................................20

Betrayal of Christians.................................................................................................................20

Attempt to infect.......................................................................................................................20

Fraud..........................................................................................................................................20

Wrong Directions.......................................................................................................................20

Weird Texts................................................................................................................................20

Betrayal......................................................................................................................................20

Use of Photography...................................................................................................................20

Sexual Harassment....................................................................................................................20

Chapter 8: Final Thoughts............................................................................................................21

**This is just a small taste of what I must present, such as further food tampering, the local churches being involved and more. I can write another book filled with evidence within a short period of time.**............................................................................................................................................21

Evidence of reports....................................................................................................................22



# Chapter 1: Talend

## Hired

I was hired on with company named Talend which proposed a great opportunity, benefits and the pay scale was healthy. Though, the change from my old job Bio-Rad was a tough option as I felt comfortable but at the same time, I felt moving forward on a new system would be a great step for my career. This all turned out to be a disaster.

## Day one

Day one, my neighbor or the person whom sat next to me started leaving trash on my desk when I would leave the room and then would get flustered when I'd ask about it. I did my best to make the situation normal and attempted to be kind to everyone around me in the best way I could. I would joke with them and ask for help and help when I could. This issue of leaving trash and other items such as empty bottles of alcohol on my desk became too consistent. So, I moved locations on the area and notified my manager of what was happening and how I wanted to resolve it. Things seemed to be fine for now.

## Monitoring

I quickly noticed some creepy monitoring they always wanted a good view of me and my work location. As my manager moved closer to me after I moved and propped up a second laptop facing my direction which seemed to be a way to record the area. The people in the area of my work location would follow me around at lunch and watch me lifting their phones which now gives me the notion they were recording too. I was given documentation to organize it and make it look presentable, later finding out some of the stuff mixed into the documentation was not correct. The documentation I produced from scratch was different as I verified it by testing it, knowing it was correct. I felt there was some tension about the documentation I was given to make presentable.

## Work

I started to notice some of my work had been deleted and it would cause me to rebuild what I needed to do and make me take longer. I questioned this lightly at first, but I shouldn't have. Eventually some of the customers also started to become unrealistic as if they were attempting to sabotage the advice and solutions given, almost as if they were placed there intentionally to attempt to frustrate me or purposely complain.

## Devices

I noticed someone had been using other devices on my machine, I noticed they had used a razer mouse on my machine. I don't own a razer mouse. As you can see, I logged it here below and took a photo of it with my phone. This was my personal laptop I would bring in a backpack because I school after work on certain days and I had to go straight to school from work. This is logic and reason I had the backpack in the office with me.



Otherwise, I would had left it at home. I noticed my belongings would be meddled through or rearranged and not sure if anything was actually missing.

## Fraud

This is when things started to get serious. The laptop I work with was also physically tampered with where someone pulled the touchpad out and I had to request a new laptop. Then I was given another laptop which was nearly unusable which caused work production to drop drastically. I asked for an additional one, but it seemed they had no more laptops in stock. Asked to commit fraud by falsifying my timecard in favor of the company, basically stealing from my paycheck. I was asked to spread out my double time over the weeks into each day instead of obtaining the double time and I was not given the second lunches as required in California labor laws. You can see the conversation here where I was able to catch him off guard and in writing to ask me to commit the fraud and steal from me and make his reports look better to his upper management. I am not sure if this was happening to the other employees, but I made a police report where they said they will not investigate this.



I contacted a previous manager Tom Ciconte in question of the situation from Bio-Rad. He had offered a spot, but something said to stay and continue to watch what these people at Talend were doing even though I truly enjoyed my time working at Bio-Rad. Someone broke my phone screen as I left it charging when I went to the bathroom. When I came back, I didn't notice but the person sitting next to me stood up and loudly stated, "what happened to your phone?". So, someone broke the screen on my phone, and they wanted to let me know. This is when I knew the damages were intentional and coming from within the office.

## Cyber Attacks

There were cyber-attacks on my home devices, going through my computer and looking at my files on monitoring what I was doing on my home machines. I received DOS attacks which are meant to slow down or completely disconnect you from the network. I found them hacking into my bank accounts as I found an Apple MACOSX computer connected and monitoring my bank account which I reported to the Chase bank and the police as well. Talend started changing or attempting to twist what was taught into something opposite of what we were taught, basically taking the training, and then telling me I was wrong from what the training said which started to tell me they were up to no good.

## Drugged

I was drugged or some sort of chemical food tampering this day was April 20th 2018 and they went to get food and brought back Brussel sprouts. Inside of these was something where I started to feel awkward and a weird sensation in my feet and back/neck area causing me to feel some pain.

You can see the police report I made. they stated they refused to investigate my problems leaving me stranded but no option but to become unemployed Brian Marlow stated he would not investigate the fraud and hacking even though I showed blatant proof of the situation, a small snicker and head shake as he left the door.

# Chapter 2: Around the living area in Irvine, California

## Car Broken Into

Not too long before I had moved into my new place my first car, the Honda Accord had the catalytic converter removed and damaged the entire intake system costing roughly $1400. Another car my Toyota Corolla was broken into, and the windows were shattered, and the car had trash thrown around inside of it. The elevators which lift the windows were broken down and had to be replaced. This happened twice mind you to the same car, the Toyota that not including the Honda Accord incidents, the police shrugging it off as me not being targeted.



The Honda Accord car had the brake fluid drained confirmed by a mechanic, nearly killing my four-year-old son and my wife,

including a pedestrian who was standing behind the car which was hit causing him to go to the hospital with a severe leg injury.



1/3/2020    1999 Honda Accord L4-2.3L Inspection Report

**Diagnostic Result Details**    N/A POOR FAIR GOOD **VERY GOOD** EXCELLENT STATUS NOTES & ADVICE FROM MECHANIC

Note

Brakes, Steering and Suspension Inspection (Inspection) : Vehicle was in a head on collision caused by no brake fluid in resevoir. Curiously there is no sign of a leak. Brake light is lit. Power steering fluid reservoir damaged in accident as well as the radiator. These are the major mechanical issues. Engine still runs.

## Attempted Murder

Amazingly enough the police officer Kyle had wrote a report stating that the cause was speeding even though he was told the brakes did not work. I took the mechanic report to the police station and it was like pulling teeth to even get them to look at it. They kept insisting the case was closed and the investigation was done.

## Home Breakins

My home was being broken into and things started to become rearranged, and I wasn't sure if things were being stolen or not, at least things I wasn't keeping perfect tabs on might have gone missing.

An example is if I were the only one home and I would leave, then come back and the lights would be left on as I was arriving making intentionally short trips, leaving them little time to escape since the others watching me outside were obviously communicating to whomever was going inside. This was beyond obvious and what they were doing inside I couldn't be too certain about it.

Another example is when I took my son to the park and when I came back, the garage door had been turned off so I couldn't get inside, and I had a latch lock on the front door so I couldn't get through the front door. Thankfully the neighbor was home as I knocked and he let me go into his back yard and I hopped the fence then  using my keys to enter the garage from the back side opening the garage from there.

## Account Hacks

I continuously made reports of these incidents and more made other reports that people were hacking into my school, work, personal and gaming accounts to no avail where again not one person stepped in to help from the authorities.


## Weird Stalker

Another incident where a guy came by stating, "sorry for kicking you out into the street" wearing a Binance sweater. I decided to figure out what he was up to, and he freaked out in less than a minute calling the police and then later finding out as he walked behind me, my son was worried he had tried to touch his butt giving the notion he was a pedophile. Since the police were essentially unhelpful in Irvine at this point, I figured they could bring my son a sticker since they did the first time the car was messed with. The man was rude and didn't ask the police to bring a sticker, so we left back home.

## Recording Stalker

Another day I found someone waiting for me outside my home recording me. I confronted them why they were recording me, they raised their voice in concern stating they would turn it off. I chased them off smacking their phone out of their hands and asked them why they like stalking people. They called the police, and the police officer that day told me it was fine for someone to record into my home through the windows, that's right they can peep into the windows and record apparently in his mind. Peeping-toms were fine apparently. Obviously, we need to review some ethical issues here and laws that are in place. Also, they told me if I hit one of them it will be assault, stating I couldn't fight back to defend myself or I will go to jail this is what the female officer had stated.

## Hit by SUV

I was hit by an SUV, yes, an SUV and this is no exaggeration either. The lady ran the stop sign and when the SUV hit me the impact from the SUV was powerful enough that my phone flew out of my pocket about twenty to thirty feet. I didn't fall down somehow, I manager to land on my feet and keep running. (Attempted murder?) This happened at the entrance of 14446 Culver Dr, Irvine, CA 92604. I looked into the car and there was also another passenger but because of the strange way they timed their way through the stop sign. I decided to keep going.

# Chapter 3: Santa Ana, California

## Towing

Immediately after moving to Santa Ana, well during the move they decided to tow my car illegally, I left the moving vehicle in the parking lot where I had purchased food from. I was taking a break and while taking my break they viciously towed the moving vehicle, and the moving company was in denial. The courts and the police both pushed back in defense of the illegal towing

## Smoke

I noticed people coming into this apartment as well when I would leave, things would be moved, and it smelled like smoke inside the room. I don't smoke but it was strongest by my computer, so they were doing something near the computer. I made a police report.

## Gym

Then at the gym, just to work out and mind my own business again people there intentionally tried to annoy me and tried to record me. I attempted to stop the recording and they all backed up and called the police. The police told me not to come back and refused to investigate further into the issue.

## Organized Strike

Then as I was trying to supply court documents, I was cut off in the middle of the street by roughly 200 people on bikes, yes 200 this is far from an exaggeration. It seemed someone didn't like I was going to the courts. The u-turn signal (left hand turn) was green for me. As I made my u-turn they started cutting me off (I was already mid turn facing the new direction) hitting my car and stopping in front of me, either run them over or stop to see what they want. I was in the far-left hand lane, the intentionally came from the right-hand lane to cut me off.) Yelling at me to get out of the car, so I did, I tried to calmly explain the light was green, they yelled still tons of them I couldn't hear anything really. I yelled "shut the fuck up", an awkward moment of silence from all of them. Then, like a pygmy tribe they attacked me and then they began fighting each other. I was a bit confused as to why they were fighting each other slamming against my car and one of them was knocked to the floor. One jumped in my car to take the keys, I went inside to get the person and they jumped out. One of them brought my keys back, then I looked around and saw people recording from their cars. I thought at this moment, I didn't know who the enemy was, so I felt it was best to leave. Then, as I got in my car, the person who stopped in front of my car "originally" yelling at me to get out of the car punches in the face again. I questioned his action with a laugh and drove off. To be honest, the adrenaline of the situation felt amazing was kind of exciting but disappointing as the attempted murder failed since I was struck in the temple. This is a spot widely known to strike when you want to kill someone.

## Shady grading

I reported to the police that the Irvine valley college, professor Vu Phan, was purposely giving me 0's on my homework as I clearly didn't deserve a 0 and then I reported him to the school district. Suddenly, the scores changed even before being talked to by the school system disciplinary staff. Shady right? This happened multiple times. I am starting to feel this was a racial attack since other options seem to be out the window.

## Mental Institution

I called the police again to let them know violence is going to happen since it has been happening. Instead of helping they told me to go see a mental health crisis center. These people tried to tell me I had paranoid ideology. Asking me if I saw things that were there, as this question deeply concerned me. I started pointing out things in the room I saw, then he started explaining, no like things on the wall or people in trees. Well, first of all people and children climb trees all the time. If I see something, how am I supposed to confirm if its there or not if I am the only one there to see it? They tried to keep me there, but I pushed the emergency button and code green blasted over the PA system. They told me not to push buttons and then more people came flooding into the lobby. I summoned more of them by pushing the button, but they eventually let me out. So, the police now, after stating they would investigate if I went there, have yet to return my call and ignore me as they have been for a while at this point, maybe two weeks. So really the police here are corrupt and not helpful in real situations it seems.

## Weird Guy

Then just to see how they would react; some dude sprayed his gardening hose in my direction and coughed at me. Then ran into his house, I asked if he wanted to hang out or be my friend... he said "no" to all of it. He wanted me attention obviously. So, the police showed up and said to stay away again instead of investigating.

## Station Supervisor

The station "supervisor" advised me that people following me around is not stalking, I quickly said "excuse me?". So, I was pissed and called back and asked to speak to the retard supervisor, he refused to take my call. Someone who thinks people following me around is not stalking, needs help.

# Chapter 4: Humanity

## Homeless Crisis

The military seems to be in a similar situation but worse, since currently at the time of this writing posted on the VA website, there are roughly 40,000 homeless veterans. While the entire country received a giant 1.9 trillion-dollar relief package. Why couldn't something of this in even such a smaller scale had been done before, we are talking in the low billions could had solved this disaster and still can. Think about this my father and both grandfathers were veterans of this country. After going through all of this regardless of if military personal or of the like were involved, I still believed it was right to stand up for the ones who may not be involved or have no knowledge. Think about it if I am someone who comes from a solid line of war veterans, dating back to a solid line of Knights and Vikings who protected Europe now gets this treatment. I have documentation and other scientific sources to back this statement up as well. Who is going to stand up for your children as a military person that lets say, you die in a heroic battle and decorated more than the rose parade protecting what you truly believe in only to know your children left behind can be going through the same treatment I received? Are you going to feel confidant leaving your children behind knowing the government and the surrounding people won't care for your family and potentially let them slide into the homelessness disaster of the United States.

James Richard Hackworth
BIRTH 22 Aug 1961
DEATH 21 Oct 2015 (aged 63–64)
BURIAL       Unknown
MEMORIAL ID 154159079

QUINCY — James Richard Hackworth, 54, of Quincy, passed away Wednesday, Oct. 21, 2015. He was a very proud veteran of the United States Navy and served during the Persian Gulf Conflict.
Jimmy was a lifetime member of VFW Post 4239 in Sidney. He enjoyed going fishing and shooting firearms. He loved his Ohio teams, the Bengals, Reds, Buckeyes, and was a fan of the LA Lakers.


human
rights_vets.pdf

## Human Rights Report

So, in return knowing there are others out there who can have the same problems or future issues. I made a Human Rights report that this is wrong and those who protect your country, risk their life and to leave their family alone if they are to fall in battle need to know their family will be secure and taken care

**ICE Tip Form**

OMB Control Number: 1653-0049
Expiration Date: 07/31/2023

U.S. Immigration and Customs Enforcement (ICE) investigates more than 400 violations of criminal law, ranging from child exploitation to transnational gangs. Use this form to report suspected criminal activity.

Be as specific and as detailed as possible. You are encouraged to provide any additional identifying details such as places of birth, countries of citizenship, and any numeric identifiers in the below narrative text box. The detailed information you provide will assist investigators as they look into reported violations.

We do not provide status updates for tip information provided. If you provide information, you can be assured that it will be promptly forwarded to the responsible office for follow up action as deemed appropriate.

Do NOT send the same information more than once, and do NOT file a duplicate report by calling the ICE Tip Line.

Although there is absolutely no guarantee that tip information provided will result in monetary payments, ICE has the discretion and statutory authorization to pay for information and/or evidence that is used in support of criminal investigations.

Anonymous tips may be reported on this form and may also be reported to ICE via the toll-free ICE Tip Line, (866) 347-2423

of by the ones they protected and not persecuted, pushed to the streets, or even humiliated. They all need at least dignity and a moderate form of respect from everyone just as anyone else you come across regardless of their background. I personally would gain no benefit from this financially. The report suggests that someone needs to write a bill and pass it through to get these homeless veterans their potential families off the streets at minimum for what they did for their country. At minimum.

Humanity? humaneness; benevolence. "he praised them for their standards of humanity, care, and dignity" This definition has become false it seems.

# Chapter 5: School

My college professors were tampering with my grades and strongly know they were involved in these horrific crimes. As you can see, he gave me a 0 score and then once I reported him, the score changed to a 7. This happened more than once, and I noticed this happened in previous classes, but I didn't question it as harshly before.

**Before**



**After**

It's a wonder why there are so many high school dropouts that became billionaires, I can't even imagine the count of billionaires that don't have a college degree. I am positive the millionaire section is polluted with high school and college dropouts. It really hits you that schools want you to conform to their standards but look what happens if you don't conform, people still become billionaires and have amazing success. Some sources say billionaires that dropped out of high school such as, John D. Rockefeller, Henry Ford, Amancio Ortega, Francois Pinault, Kirk Kerkorian, David H. Murdock, Richard

Branson, Jay-Z and Zhou Qunfei. As to the factual statement for these people you would have to ask them directly as I couldn't be certain about it this is just based on online sources.

# Chapter 6: Government Agencies

## Legal

I attempted to sue the companies involved, the United States for neglect since not point of authority wanted to assist, and the local courts only for truth and nothing more but they still hid behind lies confirming their lack of integrity by denying the cases. I noticed the legal forms were sometimes not correct or they used unethical practices to deter the case.

## FBI

I contacted the FBI, Federal Bureau of Investigation with no response. I have yet to receive any contact from them regarding my cases and reports. They also told me there was no danger, but I was attacked in the middle of the street after telling them this. I tried to let them know.

## CIA & NSA

I contacted the CIA and the NSA, again left without a strand of hope from them for any help from them.

## Military

I investigated the military, Navy specifically and began grasping the notion of everyone seemed to know me in strange way, as if they were advised I'd be arriving before hand though they were nice, I just had that strange feeling they had been contacted about me before for some odd reason.

## News

I contacted a news organization with no response really nothing but crickets.

## United Nations

I contacted the Human Rights UN organization, only to be ignored as I contacted them multiple times, I even filed reports with them as well.

## DHS

I called DHS, Department of Homeland Security, explaining the cyber-attacks and stalking. They did show up at one point but basically only listened to what I had to say and stated they had no idea how to search or investigate any of the things I reported. Basically, a similar exit as officer Brian Marlow, leaving stating "I think we are done here" being left again with no assistance. I found the cyber stalking addresses and even locations, caught them, and reported them again to the proper agencies with no assistance again.

## Government Officials

I started to contact, mayors, attorneys, senators, and other government placed figures. The irony of one senator I asked help for was specialized in gang stalking Kamala Harris the senator of my own state California becomes the Vice President while ignoring the situation. Here's what I did get.

## Kamala Harris

Link to website as what she was promoting to see website contents press this: Gang stalking Website

**Their response from her office government office.**

From: **U.S. Senator Kamala Harris** <donotreply_harris@harris.senate.gov>
Date: Wed, Dec 25, 2019, 7:49 AM
Subject: Happy Holidays!
To: <jethrohackworth@gmail.com>

A message from Senator Kamala D. Harris





Staying Connected

## Other Countries

I contacted, a giant list of countries multiple times which I either received feedback that they cannot or will not help me since I am not a citizen of their country. A few others suggested to leave the United States or contact News investigators.

## The White House

I called the White House and received nothing, telling me they couldn't help me.

## Suicide Rate

It's a wonder why there is a high rate of suicide amongst police officers and other authorities, they promote integrity in many of their stations, but this experience has taught me there must be none. Yet, they seemed to be forced or could care less not tell the truth and hide information from those they are in place to help. The ones with a weaker conscience seem to survive.

Some companies aren't caring about the disaster either.

# Chapter 7: Vanguard University

## Betrayal of Christians

This job was amplified in unspeakable betrayal, claiming to be Vanguard University of Southern California. Christians but this was farthest from the truth. Christians do not hide behind lies for they are with the other side.

## Attempt to infect

Conrad Pangan was coughing in my face while sick and was close enough to feel the droplets of saliva on my face.

## Fraud

I was asked to commit fraud this time in the reverse to steal from the company, but I did not do as requested. I put the proper time and left for the day. Even though this company had others monitoring me twenty-four seven and owes me a 24 hour a day paycheck, so they have stolen roughly $184,000 from me.

## Wrong Directions

They were giving wrong instructions and procedures on how the company works and how to complete certain tasks. Such as lying about not knowing how to transfer calls. Lying about what type of code a particular script was written in or what kind of data was being produced. They were giving instructions to reformat a machine before backing up the data on customer computers which was wrong.

## Weird Texts

Conrad Pangan Sent photos of period panties on a steering wheel just before the Toyota car gets broken into "how to prevent your car from getting broken into". Does this seem suspicious to you since this was sent right before the Toyota I had mentioned was broken into.

## Betrayal

The manager Ryan Yamanaka encouraged to apply for a higher position by the manager who then fires me after applying for the higher position stating I wasn't behaving correctly.

## Use of Photography

I asked the HR representative Nina Coppersmith not to allow the school or anyone there to record or photograph me as I did not feel comfortable with it. As I did not want it used for publicity, marketing, or any of the sorts.

## Sexual Harassment

I had other males, Thomas Riggs, touching me in inappropriate places and laughing about it, in reality there are homosexuals, but I am not for them having them touch me all over the place especially when I don't swing that way. This was awkward and continued.

# Chapter 8: Final Thoughts

So, what's the point of spying on me in my own residence, for what reason?

I cannot emphasize enough on the point that, many humans have tragic and awful lives, and they did nothing wrong, it's just the nature of the humans anymore. Thoughts where people think they are superior to one another of pieces of information, stamps, status, money, and standards. It's what makes you that's different.

I grew up being taught to respect this country, its values, the laws, and most of all the constitution. This country was founded on that core along with the foundation of faith, which those now here want to suppress and remove the faith and the historical culture of this life. Nobody respects them even though generations of people were injured, died and lost a lot to make it happen for you.

What happened?

The person(s) behind this should be charged with crimes against humanity if the conscience of those in power come to life. Those who have power can also rise into place to restructure what is corrupted.

I have no fear of dying for life after death is another place. What is the point of being afraid of death? Are you afraid to travel to another country, or planet or would you be excited? If you are excited about traveling, then what makes you afraid of death? This is my outlook which keeps me sane and knowing whatever happens, there is a day where traveling from this life is imminent and not a permanent residence for me.

Churches are involved in this corruption which is depressing as they are putting up the highest visibility, yet they destroy themselves without revealing the truth

Destroying any potential comfort to focus on what truly is meant to be in this life (gang stalking was not an original crime, it already existed, twisted copycats), stealing years of my life without a grain of conscience, consideration, and lack of remorse for what they were doing to another being. Yet, knowing the comfort still stands in faith without a wince.

While, asking for one sentence to help find the truth as to why this was going on, not one soul had the heart, courage or strong enough conscience to tell me.

**This is just a small taste of what I must present, such as further food tampering, the local churches being involved and more. I can write another book filled with evidence within a short period of time.**

## Evidence of reports

ICE,

Need assistance have been trying to contact for a while now. Terrorist activity, violence, food tampering, cyber attacks, sexual harassment property damage, stalking and more. Local police, FBI, NSA, CIA, state and federal officials have ignored this for nearly four years now. The local police stated they refuse to investigate this. What kind of corruption is that? Why can't anyone tell me what is going on?

2424 N Tustin Ave APT i8, Santa Ana CA 92705

562 826 6871

Thanks,

Jethro Hackworth







**Other Information**

If an email was used in this incident, please provide a copy of the entire email including full email headers.

[No response provided]

Are there any other witnesses or victims to this incident?

[No response provided]

If you have reported this incident to other law enforcement or government agencies, please provide the name, phone number, email, date reported, report number, etc.

[No response provided]

🖰 Check here if this an update to a previously filed complaint:



**Who Filed the Complaint**

Were you the victim in the incident described above? No
If not, please provide us with your contact information:
Name: Adriel William Hackworth
Business Name: Advanced America
Phone Number: 5626456871
Email Address: adpoohplayhouse@gmail.com

**Digital Signature**

By digitally signing this document, I affirm that the information I provided is true and accurate to the best of my knowledge. I understand that providing false information could make me subject to fine, imprisonment, or both. (Title 18, U.S. Code, Section 1001)

Digital Signature:



Thank you for submitting your complaint to the IC3. Please save or print a copy for your records. ==*This is the only time you will have to make a copy of your complaint.*==

---



HOME › ABOUT US › CONTACT NSA › OIG HOTLINE

# Report Fraud, Waste or Mismanagement

The form below will enable you to report concerns about fraud, waste or mismanagement. Simply enter your information and comments, then press the "Send Message" button to deliver the message. If you decide to report anonymously, please provide sufficient details, i.e., names, dates, organizations, contract numbers etc., to permit our office to investigate your complaint or issue.

Thank you for your submission



Case# 1808033946

Event #

**Irvine Police Department**
1 Civic Center Plaza
P.O. Box 19575
Irvine, CA 92623-9575

**Brian Marlow**
Police Officer #578
949-724-7212 Ext. 2082
cityofirvine.org/ipd
bmarlow@cityofirvine.org

 **jethro hackworth <jethrohackworth@gmail.com>**

## Your application for Quest Designer - Unannounced Project at Blizzard Entertainment

1 message

**Blizzard Entertainment Recruiting Team** <notification@jobvite.com>          Thu, Mar 28, 2019 at 10:23 PM
Reply-To: Blizzard Entertainment Recruiting Team <j3fj7q9sv@jobvite.com>
To: Jethro James Hackworth <JethroHackworth@gmail.com>

Dear Jethro James,


Hello and thank you for your interest in Blizzard Entertainment. We see you've applied for the position of Quest Designer - Unannounced Project - awesome, and good luck!

We've received your application and are currently reviewing your experience and qualifications. If we see a potential fit, a member of our recruiting team will contact you.

Please be patient; due to the volume of inquiries we receive, it can take an extended amount of time to review and process applications. We're committed to reviewing every submission by hand to ensure we're carefully considering the talents of all who apply, and to ultimately staff our teams with the best talent available in the world.

Job searches aren't always quick and painless, so we encourage you to remain pro-active in your research.

*Stay current!* Sign-up here to receive information about the jobs and disciplines you're interested in.

*Stay prepared!* Keep in mind that our job board is always the most current reflection of our current open positions. Our job board is updated multiple times a week so check back often for potential new matches! Better yet, sign up for job alerts so you don't miss a thing. http://jobs.jobvite.com/blizzard/jobAlerts

*Stay connected!* Join us @LifeatBlizzard on Twitter, where we're happy to answer questions about our openings, interviewing, and hiring process. Check out daily life through the eyes of our employees over on our Life at Blizzard Instagram channel, and as always, dive deeper into our disciplines, creative philosophies, and culture at careers.blizzard.com.


In the meantime, to view the status of your application please go to the following link:

https://app.jobvite.com/u?09a266964637253b141cb42e7a595f ba7e9a7e2aefce1d0e64179cb59b1c360a

Cheers,

Blizzard Recruiting


You can reply directly to this message or click the following link:

https://app.jobvite.com/u?c236874d7ad291c86d7e422f09cae6
a57e9a7e2aefce1d0e64179cb59b1c360a

You can change your email preferences at:
https://app.jobvite.com/l?ksKAV3gw3

 **jethro hackworth <jethrohackworth@gmail.com>**

---

## Your application for Senior Test Analyst, Shared Game Engine at Blizzard Entertainment

---

**Blizzard Entertainment Recruiting Team** <no-reply@jobvite.com>       Mon, Oct 21, 2019 at 2:31 PM
Reply-To: "no-reply@jobvite.com" <no-reply@jobvite.com>
To: Jethro Hackworth <JethroHackworth@gmail.com>

Dear Jethro,

Thank you for giving us the opportunity to consider you for employment for Senior Test Analyst, Shared Game Engine.

We regret to inform you that we will not be moving forward with your candidacy for this role at this time. This applies only to the referenced position.

If you have applied for multiple roles, you may still be in consideration for those other positions and will receive a status update for your other applications in separate emails when they become available.

We appreciate your patience and interest in a role here at Blizzard and hope you will continue to consider us in the future. We encourage you to sign up for job alerts to receive information about the jobs and disciplines you are interested in.

Best Regards,

Blizzard Recruiting

**Email Preferences | Powered by Jobvite**


                                        **jethro hackworth <jethrohackworth@gmail.com>**

---

## Your application for Test Analyst - World of Warcraft at Blizzard Entertainment
1 message

---

**Blizzard Entertainment Recruiting Team** <notification@jobvite.com>        Sun, Aug 18, 2019 at 5:13 PM
Reply-To: Blizzard Entertainment Recruiting Team <jqarfe9sh@jobvite.com>
To: Jethro James Hackworth <JethroHackworth@gmail.com>

Dear Jethro James,


Hello and thank you for your interest in Blizzard Entertainment. We see you've
applied for the position of Test Analyst - World of Warcraft - awesome, and
good luck!

We've received your application and are currently reviewing your experience
and qualifications. If we see a potential fit, a member of our recruiting team
will contact you.

Please be patient; due to the volume of inquiries we receive, it can take an
extended amount of time to review and process applications. We're
committed to reviewing every submission by hand to ensure we're carefully
considering the talents of all who apply, and to ultimately staff our teams with
the best talent available in the world.

Job searches aren't always quick and painless, so we encourage you to
remain pro-active in your research.

*Stay current!* Sign-up here to receive information about the jobs and
disciplines you're interested in.

*Stay prepared!* Keep in mind that our job board is always the most current
reflection of our current open positions. Our job board is updated multiple
times a week so check back often for potential new matches! Better yet, sign
up for job alerts so you don't miss a thing. http://jobs.jobvite.com/
blizzard/jobAlerts

*Stay connected!* Join us @LifeatBlizzard on Twitter, where we're happy to
answer questions about our openings, interviewing, and hiring process. Check
out daily life through the eyes of our employees over on our Life at Blizzard
Instagram channel, and as always, dive deeper into our disciplines, creative
philosophies, and culture at careers.blizzard.com.


In the meantime, to view the status of your application please go to the
following link:

https://app.jobvite.com/u?acb6fa2642b267c2b9cd4da494c2d052_
1064ff5c144bea716df241f0a961f6a6bbe7b30b08f48a2b9f07e04c3dceb5d3

Cheers,

Blizzard Recruiting


You can reply directly to this message or click the following link:
https://app.jobvite.com/u?692b66cef091e41b667cdc9c07d2d23c_
e89fa62d5e6bc4412f5059ddc759f0c448101336f446c46e98a1652a6487d79b

Case 8:24-cv-00025-CBM-DFM   Document 1   Filed 01/04/24   Page 59 of 136   Page ID #:59

You can change your email preferences at:
https://app.jobvite.com/l?ksKAV3gw3

**U.S. Department of Justice**
Criminal Division



# REPORTING INTELLECTUAL PROPERTY CRIME

## A Guide for Victims of Copyright Infringement, Trademark Counterfeiting, and Trade Secret Theft

### Third Edition



**U.S. Department of Justice | Computer Crime and Intellectual Property Section | October 2018**



# REPORTING INTELLECTUAL PROPERTY CRIME

## A Guide for Victims of Copyright Infringement, Trademark Counterfeiting, and Trade Secret Theft

### Third Edition

## Table of Contents

What Are Copyrights, Trademarks, and Trade Secrets? ...........................3

How Can Intellectual Property Be Stolen? .................................................3

When Is an Intellectual Property Violation a Federal Crime?...................4

Why Should You Report Intellectual Property Crime? ............................6

What Should You Do If You Are Victimized?.............................................8

Where Do I Report an Intellectual Property Crime?..............................10

   Federal Investigative Contacts ............................................................ 10

   State and Local Investigative Contacts ................................................ 12

   Prosecution Contacts........................................................................... 13

How Can You Assist Law Enforcement?..................................................14

Checklist for Reporting an Intellectual Property Crime ..........................15

   Criminal Copyright and Trademark Infringement ............................ 16

   Trade Secret Offenses......................................................................... 20

Additional Resources ...............................................................................26

> **Note**: The information contained in this document is a general guide for victims of intellectual property crime. This document is not intended to create or confer any rights, privileges, or benefits to prospective or actual witnesses or defendants. In addition, this document is not intended as a United States Department of Justice directive or as a document that has the force of law.

# What Are Copyrights, Trademarks, and Trade Secrets?

The United States has created enforceable rights in "intangibles" that are known as intellectual property, including copyrights, trademarks, and trade secrets. **Copyright law** provides federal protection against infringement of certain exclusive rights, such as reproduction and distribution, of "original works of authorship," including computer software, literary works, musical works, and motion pictures. 17 U.S.C. §§ 102(a), 106. The use of a commercial brand to identify a product is protected by **trademark law**, which prohibits the unauthorized use of "any word, name, symbol, or device" used by a person "to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods." 15 U.S.C. § 1127. Finally, **trade secret law** prohibits the unauthorized disclosure of any confidential and proprietary information, such as a formula, device, or compilation of information but only when that information possesses an independent economic value because it is secret and the owner has taken reasonable measures to keep it secret. 18 U.S.C. §§ 1831, 1832.  For more information on these rights and how they are criminally enforced, *see* Prosecuting Intellectual Property Crimes (4th ed. 2013), U.S. Department of Justice, Computer Crime and Intellectual Property Section (www.justice.gov/criminal-ccips/ccips-documents-and-reports).

# How Can Intellectual Property Be Stolen?

Intellectual property can be stolen (*i.e.*, infringed or misappropriated) in many ways. For example, copyrighted works, such as movies, music, books, software or games, may be illegally infringed by reproducing or distributing unauthorized copies of such works either online or by manufacturing and distributing infringing CDs or DVDs containing the unauthorized content. A trademark or service mark may be infringed by offering goods, services, labels or other packaging containing a counterfeit mark. A trade secret can be surreptitiously misappropriated from its owner either by a company insider or by someone outside a company and used to benefit the thief, a competitor, or other third party.

# When Is an IP Violation a Federal Crime?

Although individuals or companies can pursue civil remedies to address violations of their intellectual property rights, criminal sanctions are often warranted to ensure sufficient punishment and deterrence of wrongful activity. Congress has continually expanded and strengthened criminal laws for violations of intellectual property rights to protect innovation, to keep pace with evolving technology and, significantly, to ensure that egregious or persistent intellectual property violations do not merely become a standard cost of doing business for defendants. In most instances, the statutes of limitations for intellectual property crime is five years, but may be extended in some circumstances, such as an ongoing or continuing crime.   Among the most significant criminal provisions are the following:

❑   **Counterfeit Trademarks:**  The Trademark Counterfeiting Act, 18 U.S.C. § 2320(b)(1)(A), provides penalties of up to ten years' imprisonment and a $2 million fine for a defendant who intentionally "traffics in goods or services and knowingly uses a counterfeit mark on or in connection with such goods or services," or intentionally "traffics in labels, . . . documentation, or packaging . . . knowing that a counterfeit mark has been applied thereto." Section 2320(b)(3) provides penalties of up to twenty years' imprisonment and a $5 million fine for a defendant who intentionally traffics in counterfeit drugs or certain counterfeit military goods or services.

❑   **Counterfeit Labeling:**  The counterfeit labeling provisions of 18 U.S.C. § 2318 prohibit trafficking in counterfeit labels designed to be affixed to movies, music, software, and literary, pictorial, graphic, or sculptural works and works of visual art as well as trafficking in counterfeit documentation or packaging for such works. Violations are punishable by up to five years' imprisonment and a $250,000 fine.

❑   **Criminal Copyright Infringement:**  Copyright infringement is a felony punishable by up to three years' imprisonment and a $250,000 fine under 17 U.S.C. § 506(a) and 18 U.S.C. § 2319 where a defendant willfully *reproduces* or *distributes* at least ten copies of one or more copyrighted works with a total retail value of more than $2,500 within a 180-day period. The maximum penalty rises to five years' imprisonment if the defendant also acted "for purposes of commercial advantage or private financial gain." Misdemeanor copyright infringement occurs where the value exceeds $1,000 or where the defendant willfully violated any of the exclusive rights "for purposes of commercial advantage or private financial gain."

❑ **Pre-Release Criminal Copyright Infringement:** Pre-release piracy, *i.e.*, willful infringement "by the distribution of a work being prepared for commercial distribution, by making it available on a computer network accessible to members of the public, if such person knew or should have known that the work was intended for commercial distribution," is a felony punishable by up to three years' imprisonment and a $250,000 fine under 17 U.S.C. § 506(a)(1)(C) and 18 U.S.C. § 2319(d). The maximum penalty rises to five years' imprisonment if the defendant also acted "for purposes of commercial advantage or private financial gain."

❑ **Theft of Trade Secrets:** The Economic Espionage Act contains two separate provisions that criminalize the theft of trade secrets. The first provision, 18 U.S.C. § 1831, prohibits the theft of trade secrets for the benefit of a foreign government, instrumentality, or agent, and is punishable by up to 15 years' imprisonment and a $5,000,000 fine. The second, 18 U.S.C. § 1832, prohibits the commercial theft of trade secrets to benefit someone other than the owner, and is punishable by up to ten years' imprisonment and a $250,000 fine. The penalties are higher for defendants who are companies.  The statute broadly defines the term "trade secret" to include all types of information that the owner has taken reasonable measures to keep secret and that itself has independent economic value. 18 U.S.C. § 1839(3). Federal law also provides special protections to victims in trade secret cases to ensure that the confidentiality of trade secret information is preserved during the course of criminal proceedings.  Specifically, the statute expressly states that courts "shall enter such orders and take such action as may be necessary and appropriate to preserve the confidentiality of trade secrets, consistent with the requirements of the Federal Rules of Criminal and Civil Procedure, the Federal Rules of Evidence, and all other applicable laws." 18 U.S.C. § 1835(a); *see also* Levine & Flowers, How Prosecutors Protect Trade Secrets, 38 Am. J. Trial Advoc. 461 (2014-2015).

❑ **Camcording:** The Family Entertainment and Copyright Act criminalizes the use of camcorders and similar devices to record movies playing in public theaters. "Camcording" is a felony punishable by up to three years imprisonment' and a $250,000 fine under 18 U.S.C. §2319B(a) where a defendant "knowingly uses or attempts to use an audiovisual recording device to transmit or make a copy of a motion picture. . . in a motion picture exhibition facility."

❑ **Additional Charges:**  Where appropriate, prosecutors may respond to intellectual property crime with additional charges, such as Wire Fraud (18 U.S.C. § 1343), Mail Fraud (18 U.S.C. § 1341), Computer Fraud and Abuse Act (18 U.S.C. § 1030), and Smuggling (18 U.S.C. § 545).

# Why Should You Report Intellectual Property Crime?

Intellectual property is an increasingly important part of the United States economy, representing its fastest growing sector, contributing billions of dollars to America's gross domestic product, and employing over 45 million Americans, according to the Global Intellectual Property Center. *See* www.theglobalipcenter.com.  As the nation continues to shift from an industrial economy to an information-based economy, the assets of the country are increasingly based in intellectual property. In addition, intellectual property crime in the United States and abroad not only threatens our nation's economic well-being, it can also place at risk the public health and safety of our citizens and our national security.

In recognition of this trend, the Department of Justice is waging an aggressive campaign against intellectual property crime in all its forms.  For more information on the Department's efforts, see the Department's Annual PRO IP Act Reports. *See* www.justice.gov/criminal/cybercrime/documents.html.

Effective prosecution of intellectual property crime, however, also requires substantial assistance from its victims. Because the victims of intellectual property crime are often in the best position to detect a theft, law enforcement authorities cannot act in many cases unless the crimes are reported in the first place. Once these crimes are reported, federal law enforcement authorities need to quickly identify the facts that establish jurisdiction for the potential intellectual property offenses, such as federal copyright and trademark registration information, as well as facts concerning the extent of a victim's potential loss, the nature of the theft, and possible suspects. In a digital world where evidence can disappear at the click of a mouse or the tap of a smartphone, federal law enforcement has the ability to quickly preserve digital evidence in more than 80 countries.  Federal law enforcement also has the ability to deter foreign IP criminals by extraditing them to the U.S. for prosecution, assisting in a foreign prosecution, or by supporting the imposition of diplomatic responses, such as sanctions or blacklisting.

Accordingly, the Department of Justice has created this guide for victims to facilitate the flow of critical information from victims of intellectual property crimes to law enforcement authorities. The Department of Justice's goal is to make it as easy as possible to report incidents of intellectual property crime to law enforcement authorities, including whom to contact and what to tell them.

**Note**: The guidelines set forth below seek information that, in the experience of Department of Justice prosecutors and investigators, is useful or even critical to the successful prosecution of the most common intellectual property crimes. These guidelines are not intended to be exhaustive, nor does the presence or absence of responsive information from the victim necessarily determine the outcome of an investigation.

# What Should You Do If You Are Victimized?

Victims of intellectual property crime, such as copyright infringement, trademark counterfeiting, and theft of trade secrets, often conduct internal investigations before referring matters to law enforcement. These investigations can encompass a variety of steps, including interviewing witnesses, acquiring samples of the counterfeit goods, conducting surveillance of suspects, and examining computers and other evidence. Victims can maximize the benefit of these independent investigative activities as follows:

❑   **Document All Investigative Steps:**  To avoid duplication of effort and retracing of steps, internal investigations should seek to create a record of all investigative steps that can later be presented to law enforcement, if necessary, including the names, titles and contact information of persons with knowledge of each step. If a victim company observes counterfeit goods for sale online and makes a purchase, for example, investigators should record the domain name, URL, and IP address of the website, the date and time of the purchase, the method of payment, and the date and manner of delivery of the goods. Any subsequent examination or testing of the goods should then be recorded in a document that identifies the telltale characteristics of theft or specific indicators of counterfeiting, such as lack of a security seal, poor quality, failure to meet specifications, packaging, or the like.

Similarly, in the case of a suspected theft of trade secrets, any internal investigation or surveillance of the suspect, or a competitor believed to be using the stolen information, should be recorded.  Records of any interviews with suspects or witnesses should be made by tape or in writing. The pertinent confidentiality agreements, security policies, and access logs should also be gathered and maintained to facilitate review and reduce the risk of deletion or destruction.

❑   **Preserve the Evidence:**  Any physical, documentary, or digital evidence acquired in the course of an internal investigation should be preserved for later use in a legal proceeding. In the online theft example identified above, victims should print out or obtain a digital copy of the offending website, preserve any e-mails or texts related to the counterfeit item(s), and safely store any infringing goods and their packaging, which may contain details of their origin. Additionally, print out and preserve any documentation of the course of dealing with the offending seller, including (but not limited to) any sales agreements or contracts, communications about the purchase, or other such documentation. If the computer of an employee suspected of stealing trade secrets has been seized,

any forensic analysis should be performed on a copy of the data, or "digital image," to refute claims that the evidence has been altered or corrupted.

❑   **Contact Law Enforcement Right Away:**  Victims can maximize their legal remedies for intellectual property crime by making contact with law enforcement soon after its detection. Early referral to law enforcement is the best way to ensure that evidence of an intellectual property crime is properly secured and that all investigative avenues are fully explored, such as the execution of search warrants and possible undercover law enforcement activities. Communication with law enforcement authorities at the onset of suspected violations also allows a victim to coordinate administrative or civil proceedings with possible criminal enforcement. Use the reporting checklists set forth later in this guide to organize the information you gather and provide the necessary information to your law enforcement contact.

# Where Do I Report an Intellectual Property Crime?

Although there are a variety of ways to report an intellectual property crime to law enforcement, the following list identifies the most common and efficient investigative and prosecutorial contacts.

## Federal Investigative Contacts

❑ **National Intellectual Property Rights Coordination Center ("IPR Center").** The IPR Center is an interagency task force led by U.S. Immigration and Customs Enforcement, Homeland Security Investigations ("ICE-HSI"). The IPR Center is a collaborative effort by over 19 U.S. government investigative and regulatory agency partners, including the Federal Bureau of Investigation ("FBI"), as well as representatives from Interpol, Europol, Canada and Mexico, that work together to combat intellectual property crime. IPR Center partners work together to investigate and deconflict case leads, interdict counterfeit and pirated goods at the borders, and provide extensive training and outreach. The IPR Center also works closely with the Department of Justice through the Criminal Division's Computer Crime and Intellectual Property Section. The IPR Center encourages victims to visit its website at  www.IPRCenter.gov to obtain more information about the IPR Center and to report violations of intellectual property rights online or by emailing IPRCenter@dhs.gov.  You can also report IP crime by clicking on The IRP Center's "Report IP Theft" button.

❑ **Federal Bureau of Investigation ("FBI").** The FBI's Criminal Investigative Division's Intellectual Property Rights Unit ("IPRU") oversees its national intellectual property rights program, which includes dedicated FBI Special Agents responsible for investigating (i) thefts of trade secrets, (ii) manufacturing and trafficking in counterfeit goods, and (iii) IPR infringement, which causes significant economic impact. The IPRU is headquartered at the IPR Center, and the FBI Special Agents dedicated to investigating IP crime are located in field offices throughout the country. The IPRU's agents work closely with all FBI field offices to combat IP crime. The FBI's IPRU encourages victims to report intellectual property crimes through the IPR Center or to any of the FBI's 56 field offices and 63 international legal attaches.  Rights holders are also encouraged to develop a relationship with an FBI agent in a local field office *before* an incident

occurs.  A list of the FBI field offices is available online at www.fbi.gov/contact-us/field/field-offices.

❑   **Internet Crime Complaint Center ("IC3").** IC3 is a partnership between the FBI, the National White Collar Crime Center, and the Department of Justice's Bureau of Justice Assistance. IC3 receives, develops, and refers criminal complaints involving a range of cybercrimes including intellectual property crime occurring online. IC3 encourages victims to report complaints involving cybercrime though its website at www.ic3.gov.

❑   **U.S. Food and Drug Administration—Office of Criminal Investigations ("OCI").** OCI protects the public health and furthers the FDA mission by investigating suspected criminal violations of the Federal Food, Drug, and Cosmetic Act ("FDCA") and other related laws.  Among other things, OCI investigates breaches in the legitimate medical supply chain by individuals and organizations dealing in unapproved, counterfeit, and substandard medical products.  Those who work in the pharmaceutical industry should be aware that the Drug Supply Chain Security Act ("DSCSA") requires certain trading partners (manufacturers, repackagers, wholesale distributors, and dispensers), to notify FDA and all appropriate immediate trading partners not later than 24 hours after making the determination that a product is illegitimate.  Manufacturers are additionally required to notify FDA and appropriate immediate trading partners not later than 24 hours after the manufacturer determines or is notified by FDA or a trading partner that there is a high risk that a product is illegitimate. The DSCSA also requires that manufacturers, repackagers, wholesale distributors, and dispensers consult with FDA before terminating the notification about an illegitimate product.

## State and Local Investigative Contacts

Federal, state, and local law enforcement agencies and prosecutors all over the country have formed task forces or other working groups to combat computer and intellectual property crime and to promote information sharing between all levels of law enforcement and industry. A state or local task force may be an appropriate contact for cases that do not meet federal criminal thresholds. Examples of these task forces include:

❑   **DOJ-Funded Intellectual Property Enforcement Task Forces.** Since the inception of the program in FY2009, OJP has awarded more than $26 million in grants to support state and local law enforcement agencies, training and technical assistance providers, and an IP public education campaign. Of this total amount of funding, state and local law enforcement agencies have received more than $19 million.  More information on the grant program is available online at www.bja.gov/ProgramDetails.aspx?Program_ID=64. To determine whether a task force has been funded in a particular area, see the following link to past grant recipients: www.bja.gov/funding.aspx#3.

❑   **InfraGard**. The FBI has founded more than 80 chapters of InfraGard – a government and private sector alliance developed to promote the protection of critical information systems – around the country. *See* www.infragard.net for more information about InfraGard generally and to find your local chapter.

❑   **Electronic Crimes Task Forces.** The United States Secret Service ('USSS") has created Electronic Crimes Task Forces in 40 cities. More information on the USSS and the Electronic Crimes Task Force program can be found at www.secretservice.gov/investigation/.

## Prosecution Contacts

Because of the often complex nature of intellectual property crime and the rapid response required by law enforcement, early engagement of prosecutors often can be helpful. Victims can contact Department of Justice prosecutors in the following ways:

❑   **Computer Hacking and Intellectual Property ("CHIP") Coordinators.** Each of the 93 U.S. Attorneys' Offices throughout the country has at least one Assistant U.S. Attorney who serves as a CHIP coordinator. There are also many districts that have two or more CHIP prosecutors.  In total, the Department of Justice has a network of over 270 federal prosecutors who specialize in prosecuting high tech crimes, including intellectual property crimes. The core responsibilities of CHIP prosecutors include (1) prosecuting computer crime and intellectual property offenses; (2) serving as the district's legal counsel on matters relating to those offenses and the collection of electronic or digital evidence; (3) training prosecutors and law enforcement personnel in the region; and (4) conducting public and industry outreach and awareness activities. Victims can contact CHIP prosecutors in their district by calling the local U.S. Attorney's Office and asking for the CHIP prosecutor. A list of U.S. Attorneys' Offices is available online at www.justice.gov/usao/us-attorneys-listing.

❑   **Computer Crime and Intellectual Property Section ("CCIPS")**. CCIPS is a section within the Department of Justice's Criminal Division. CCIPS has a core team of expert IP prosecutors who prosecute IP crimes and help coordinate multi-district and international IP cases.  In addition to prosecution, CCIPS attorneys assist in developing and implementing the Department's overall criminal enforcement strategy to combat intellectual property crime, provide domestic and international training on investigating and prosecuting intellectual property cases, and conduct industry outreach. CCIPS also houses the National CHIP Coordinator to help manage the CHIP Network. In these efforts, CCIPS works closely with the IPTF, U.S. Attorneys' Offices, CHIP coordinators, the IPR Center, and the FBI, among other agencies.  More information about CCIPS is available online at www.cybercrime.gov and at (202) 514-1026.

❑   **Intellectual Property Law Enforcement Coordinators ("IPLECs")**.  The Department of Justice's IPLEC program places experienced prosecutors in high-impact regions to enhance individual countries' capacities to investigate and prosecute IP crimes and to develop regional networks to more effectively deter and detect IP crimes.  The Department of Justice currently has regional IPLECs in Romania, Hong Kong, Thailand, Nigeria, and Brazil.  More information about the IPLEC program is available at www.justice.gov/criminal-ccips/overseas-work.

# How Can You Assist Law Enforcement?

Prosecutions of intellectual property crime often depend on cooperation between victims and law enforcement. Indeed, without information sharing from intellectual property rights holders, prosecutors can neither discern the trends that suggest the most effective overall enforcement strategies, nor meet the burden of proving an intellectual property offense in a specific case. In addition to the checklist of information that would be helpful to include when reporting a violation, the following seeks to provide guidance concerning the types of ongoing assistance that may be offered by victims of intellectual property crime to law enforcement authorities.

❑   **Identify Stolen Intellectual Property:**  Just as in cases involving traditional theft, such as a burglary or shoplifting, victims of intellectual property crime may – and often must – assist law enforcement in the identification of stolen property. Thus, law enforcement may call upon a victim representative or expert to examine items obtained during an investigation to determine their origin or authenticity. In a copyright infringement or counterfeit trademark investigation, for example, an author or software company may be called upon to analyze CDs, DVDs, or other media that appear to be counterfeit, while a victim representative in a theft of trade secret case may be asked to review internal documents or computer source code, as well as public materials such as patents and scientific publications. Prosecutors may later seek fact and/or expert testimony from the victims at trial.

In certain investigations, law enforcement agents also may request a victim's presence during the execution of a search warrant to help the agents identify specific items to be seized. In those circumstances, the victim's activities will be strictly limited to those directed by supervising law enforcement agents.

❑   **Share the Results of Internal Investigations or Civil Lawsuits:**  As with any suspected crime, victims may provide law enforcement with information gathered as a result of internal investigations into instances of intellectual property theft. In addition, unless a court has ordered otherwise, victims may generally provide law enforcement with any evidence or materials developed in civil intellectual property enforcement actions, including court pleadings, deposition testimony, documents, and written discovery responses.

❑   **Contributions of Funds, Property, or Services:**  Donating funds, property, or services to federal law enforcement authorities can raise potential legal and ethical issues that must be addressed on a case-by-case basis. In general, federal law places limitations on contributions to law enforcement authorities.



# REPORTING INTELLECTUAL PROPERTY CRIME

## A Guide for Victims of Copyright Infringement, Trademark Counterfeiting, and Trade Secret Theft

### Third Edition

## Checklist for Reporting an Intellectual Property Crime

This checklist serves as a guide for the type of information that would be helpful for a victim or a victim's authorized representative to include when reporting an intellectual property violation to law enforcement.  The checklist contains two sections: one intended for use in criminal copyright and trademark cases, and the other intended for use in criminal trade secret cases.  We encourage victims to report suspected crimes to law enforcement as soon as possible, with as much of the below information as time and circumstances allow.  Victims typically do not have a complete picture of the criminal conduct and related facts and circumstances when the crime is first discovered.  Law enforcement agents conduct investigations to find the truth and have investigative tools that are unavailable to private citizens and businesses.  *Please note that a victim's written statements—even emails to law enforcement agents—may be discoverable in subsequent litigation.*

Prosecutors and/or investigators may also use the checklist as a framework to gather information from victims. They can be adapted for use in other intellectual property offenses as well.  Reviewing the checklist *before* an incident occurs may also help rights holders identify what type of information they should be generating on an ongoing basis to help protect their rights.

### Criminal Copyright and Trademark Infringement

- ✓ Background / Contact Information
- ✓ Description of the Intellectual Property (IP)
- ✓ Description of the Suspected IP Crime
- ✓ Origin and Entry (If Applicable)
- ✓ Possible Suspects
- ✓ Internet Involvement
- ✓ Civil Enforcement Proceedings

### Criminal Trade Secret Offenses

- ✓ Note on Confidentiality
- ✓ Background / Contact Information
- ✓ Description of the Trade Secret
- ✓ Measures Taken to Protect the Physical Trade Secret Location
- ✓ Confidentiality and Non-Disclosure Agreements
- ✓ Electronically-Stored Trade Secrets
- ✓ Document Controls
- ✓ Employee Controls
- ✓ Description of the Trade Secret's Misappropriation
- ✓ Civil Enforcement Proceedings

# Criminal Copyright and Trademark Infringement

1. **Background and Contact Information**

   ❑ Victim's Name:
   ❑ Primary Address:
   ❑ Nature of Business:
   ❑ Primary Contact:
   ❑ Work Phone:
   ❑ Mobile Phone:
   ❑ E-mail:
   ❑ Fax:
   ❑ In addition to primary contact listed above, please be prepared to provide the names, titles and contact information of all people with knowledge of information requested below.

2. **Description of the Intellectual Property**

   ❑ Describe the copyrighted material or trademark/service mark/certification mark (*e.g.*, title of copyrighted work, identity of logo), including any factors that make its infringement especially problematic (*e.g.*, threats to public health and safety, pre-release piracy).

   ❑ Is the work or mark registered with the U.S. Copyright Office or on the principal register of the U.S. Patent and Trademark Office?[1] ___ YES ___NO

   If yes, please provide the following:

   ○ Registration Date:
   ○ Registration Number:

   If no, state if and when you intend to register:

   ❑ Do you have a certified copy of the certificate of registration?  ___ YES ___NO

---

[1] Registered trademarks can be found through the U.S. Patent & Trademark Office's searchable database at: tess2.uspto.gov

❑ Is the work or mark recorded with U.S. Customs and Border Protection (CBP)?[2]
___ YES ___NO

If yes, please provide the following:

○ Recordation Date:

○ Recordation Number:

❑ What is the approximate retail value of the infringed work, good, or service?

❑ Has the work or mark been the subject of a previous civil or criminal enforcement action? If so, please provide a general description as well as the case name, case number, and name of court.

**3. Description of the Intellectual Property Crime**

❑ Describe how the theft or counterfeiting was discovered.

❑ Do you have any examination reports of the infringing or counterfeit goods?
___YES ___NO

If yes, please provide those reports to law enforcement. Please also provide a photograph or sample of the goods, if possible.

❑ Describe the type of infringement (*e.g.*, manufacture, reproduction, import, export, distribution).

❑ Describe the scope of the infringing operation, including the following information:

○ Estimated quantity of illegal distribution:

○ Estimated value of illegal distribution:

○ Estimated time period of illegal distribution:

○ Is the illegal distribution national or international? Which states and/or countries?

---

[2] IP rights holders can apply online at apps.cbp.gov/e-recordations/ to record their trademarks and copyrights with CBP to protect against the importation of infringing products.

❑ Identify where the infringement or counterfeiting occurred, and describe the location.

**4.   Origin and Entry (If Applicable)**

❑ Identify the country of origin of the infringing item.

❑ Identify the date, location, and mode of entry into the United States.

❑ Identify the names of shippers and Harmonized Tariff Schedule designation and provide any other applicable shipping or customs information.

**5.   Possible Suspects**

❑ Identify the name(s) or location(s) of all possible suspects, including the following information:

  ○ Name:
  ○ Phone number:
  ○ E-mail address:
  ○ Physical address:
  ○ Current employer, if known:
  ○ Any other identifiers:
  ○ Reason for suspicion:

**6.   Internet Involvement**

❑ If the distribution of infringing or counterfeit goods involves the Internet, identify the following:

  ○ How the Internet is involved (*e.g.*, websites, FTP, mail, chat rooms):
  ○ Relevant Internet address, including any affiliate websites (domain name, URL, IP address, e-mail):
  ○ Login or password for website:
  ○ Operators of website, if known:
    ▪ Location of the servers and website host:
    ▪ Country where domain name is registered:

○ Has the rights holder sent a cease and desist notice to the website?
   ___YES ___NO

   If yes, please provide the following:

   ▪ Date of notice:
   ▪ Do you have a copy of the notice?  ___ YES ___NO

❑ If you have conducted an internal investigation into the theft or counterfeiting activities, please describe any evidence acquired and submit, if possible, any investigative reports.

**7. Civil Enforcement Proceedings**

❑ Have you ever received counterfeit goods from the target listed above?
   ___YES ___NO

❑ If yes, did you place the target on notice that the goods received were counterfeit?

❑ Has a civil enforcement action been filed against the suspects identified above?
   ___YES ___NO

   If yes, identify the following:

   ○ Name of court and case number:
   ○ Date of filing:
   ○ Names of attorneys:
   ○ Status of case:

   If no, please state whether a civil action contemplated, what type and when.

❑ Have you contacted any other government agencies about this incident?

   If yes, identify the agency contacted.

❑ Please provide any information concerning the suspected crime not described above that you believe might assist law enforcement.

# Trade Secret Offenses

> **Note on Confidentiality**: Federal law provides that courts "shall enter such orders and take such action as may be necessary and appropriate to preserve the confidentiality of trade secrets, consistent with the requirements of the Federal Rules of Criminal and Civil Procedure, the Federal Rules of Evidence, and all other applicable laws." 18 U.S.C. § 1835. Prosecutors generally will use protective orders and other appropriate measures to vigorously protect trade secrets during investigation and prosecution. *See* Levine & Flowers, How Prosecutors Protect Trade Secrets, 38 Am. J. Trial Advoc. 461 (2014-2015).

1. **Background and Contact Information**

   ❑ Victim's Name:
   ❑ Primary Address:
   ❑ Nature of Business:
   ❑ Primary Contact:
   ❑ Work Phone:
   ❑ Mobile Phone:
   ❑ E-mail:
   ❑ Fax:

   ❑ In addition to primary contact listed above, please be prepared to provide the names, titles and contact information of all people with knowledge of information requested below.

2. **Description of the Trade Secret**

   ❑ Generally describe the trade secret (*e.g.*, source code, formula, technology, process, device), and explain how that information differs from that disclosed within any issued patents and/or published patent applications.

   ❑ Provide an estimated value of the trade secret using one or more of the methods listed below:

---

| Estimated Value | Method |
|---|---|
| | Cost to develop the trade secret |
| | Acquisition cost (include date / source of acquisition) |
| | Fair market value if sold / licensed |

**3.  Measures Taken to Protect the Physical Trade Secret Location**

> **Note**: While the questions below address some common measures that rights holders may take to protect IP, there is no legal requirement that rights holders take all or even most of these particular measures.  Whether a rights holder has taken "reasonable measures" to protect its IP is a context-specific determination that must be made on a case-by-case basis.

❑   Describe the company's general security practices concerning entry to and moving within its premises, such as fencing the perimeter of the premises, visitor control systems, using alarming or self-locking doors or security personnel.

❑   Describe any security measures the company has employed to prevent unauthorized viewing or access to the trade secret, such as locked storage facilities or "Authorized Personnel Only" signs at access points.

❑   Describe any protocol the company employs to keep track of employees accessing trade secret material such as sign in/out procedures for access to and return of trade secret materials.

❑   Are employees required to wear identification badges? ___YES ___ NO

❑   Does the company have a written security policy? ___YES ___NO

If yes, please provide the following information:

&#9711;  Does the security policy address in any way protocols on handling confidential or proprietary information? ___YES ___NO

&#9711;  How are employees advised of the security policy?

&#9711;  Are employees required to sign a written acknowledgment of the security policy? ___YES ___NO

❑  How many employees have access to the trade secret?

❑  Was access to the trade secret limited to a "need to know" basis? ___YES ___NO

If yes, describe how "need to know" was maintained in any ways not identified elsewhere (*e.g.*, closed meetings, splitting tasks between employees and/or vendors to restrict knowledge):

**4.  Confidentiality and Non-Disclosure Agreements**

❑  Does the company enter into confidentiality and non-disclosure agreements with employees and third parties concerning the trade secret? ___YES ___NO

❑  Has the company established and distributed written confidentiality policies to all employees? ___YES ___NO

❑  Does the company have a policy for advising company employees regarding the company's trade secrets? ___YES ___NO

**5.  Electronically-Stored Trade Secrets**

❑  If the trade secret is computer source code or other electronically-stored information, how is access regulated (*e.g.*, are employees given unique user names, passwords, and electronic storage space, and was the information encrypted)?

❑  If the company stores the trade secret on a computer network, is the network protected by a firewall? ___YES ___NO

❑ Is remote access permitted into the computer network? ___YES ___NO

   If yes, is a virtual private network utilized?  ___YES ___NO

❑ Is the trade secret maintained on a separate computer server? ___YES ___NO

❑ Does the company prohibit employees from using unauthorized computer programs or unapproved peripherals, such as high capacity portable storage devices? ___YES ___NO

❑ Does the company maintain electronic access records such as computer logs? ___YES ___NO

**6. Document Controls**

❑ If the trade secret consists of documents, were they clearly marked "CONFIDENTIAL" or "PROPRIETARY"? ___YES ___NO

❑ Describe the document control procedures employed by the company, such as limiting access and sign in/out policies.

❑ Was there a written policy concerning document control procedures? ___YES ___NO

   If yes, how were employees advised of it?

**7. Employee Controls**

❑ Are new employees subject to a background investigation? ___YES ___NO

❑ Does the company conduct regular training for employees concerning steps to safeguard trade secrets?___YES ___NO

❑ Does the company hold "exit interviews" to remind departing employees of their obligation not to disclose trade secrets? ___YES ___NO

8. **Description of the Misappropriation of the Trade Secret**

❑ Identify the name(s) or location(s) of all possible suspects, including the following information:

  ⭕ Name:
  ⭕ Phone number:
  ⭕ E-mail address:
  ⭕ Physical address:
  ⭕ Current employer, if known:
  ⭕ Any other identifiers:
  ⭕ Reason for suspicion:

❑ Describe how the misappropriation of the trade secret was discovered.

❑ Describe the type(s) of misappropriation (*e.g.*, stealing, copying, drawing, photographing, downloading, uploading, altering, destroying, transmitting, receiving).

❑ If known, was the trade secret stolen to benefit a third party, such as a competitor or another business? ___YES ___NO

  If yes, identify that business and its location.

❑ Do you have any information that the trade secret was stolen to benefit a foreign government or instrumentality of a foreign government? ___YES ___NO

  If yes, identify the foreign government or instrumentality and describe that information.

❑ If the suspect is a current or former employee, describe all confidentiality and non-disclosure agreements in effect.

❑ Identify any physical locations associated with the misappropriated trade secret, such as where it may be currently stored or used.

❑ If you have conducted an internal investigation into the misappropriation, please describe any evidence acquired and provide any investigative reports that you can.

9. **Civil Enforcement Proceedings**

❑ Has a civil enforcement action been filed against the suspects identified above? ___YES ___NO

If yes, please provide the following information:

○ Name of court and case number:
○ Date of filing:
○ Names of attorneys:
○ Status of case:

If no, please state whether a civil action contemplated, what type and when.

❑ Have you contacted any other government agencies about this incident?

If yes, identify the agency contacted.

❑ Please provide any information concerning the suspected crime not described above that you believe might assist law enforcement.

# Additional Resources

❏ CCIPS Website:  www.cybercrime.gov

❏ CCIPS Main Number: (202) 514-1026

❏ Prosecuting Intellectual Property Crimes Manual (available online at
www.justice.gov/criminal/cybercrime/docs/prosecuting_ip_crimes_manual_201
3.pdf)

❏ Prosecuting Computer Crimes Manual (available online at
www.justice.gov/criminal/cybercrime/docs/ccmanual.pdf)

❏ Levine & Flowers, How Prosecutors Protect Trade Secrets, 38 Am. J. Trial Advoc.
461 (2014-2015) (available online at www.justice.gov/criminal-
ccips/file/640271/download)

❏ Best Practices for Victim Response and Reporting of Cyber Incidents (available
online at www.justice.gov/criminal-ccips/file/1096971/download)

❏ Arranging a Speaker from CCIPS (available online at www.justice.gov/criminal-
ccips/arranging-speakers)

*No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment.*

UNIVERSAL DECLARATION OF HUMAN RIGHTS (1948, art. 5)
INTERNATIONAL COVENANT ON CIVIL AND POLITICAL RIGHTS (1976, art. 7)

*[T]he term "torture" means any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions.*

CONVENTION AGAINST TORTURE AND OTHER CRUEL, INHUMAN OR DEGRADING TREATMENT OR PUNISHMENT (1984, art. 1, para.1)

# Introduction

Torture seeks to annihilate the victim's personality and denies the inherent dignity of the human being. The United Nations has condemned torture from the outset as one of the vilest acts perpetrated by human beings on their fellow creatures.

Torture is a crime under international law. According to all relevant instruments, it is absolutely prohibited and cannot be justified under any circumstances. This prohibition forms part of customary international law, which means that it is binding on every member of the international community, regardless of whether a State has ratified international treaties in which torture is expressly prohibited. The systematic or widespread practice of torture constitutes a crime against humanity.

In 1948, the international community condemned torture and other cruel, inhuman or degrading treatment in the Universal Declaration of Human Rights adopted by the United Nations General Assembly. In 1975, responding to vigorous activity by non-governmental organizations (NGOs), the General Assembly adopted the Declaration on the Protection of All Persons from Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.

During the 1980s and 1990s, progress was made both in the development of legal standards and instruments and in enforcement of the prohibition of torture. The United Nations Voluntary Fund for Victims of Torture was established by the General Assembly in 1981 to fund organizations providing assistance to victims of torture and their families. The Convention against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment was adopted by the General Assembly in 1984 and came into force in 1987. Its implementation by States parties is monitored by a body of independent experts, the Committee against Torture. The first Special Rapporteur on torture, an independent expert mandated to report on the situation of torture in the world, was appointed by the Commission on Human Rights in 1985. During the same period, the General Assembly adopted resolutions in which it highlighted the role of health personnel in protecting prisoners and detainees against torture and established general principles for the treatment of detained persons. In December 1997, the General Assembly proclaimed 26 June United Nations International Day in Support of Victims of Torture.

The United Nations has repeatedly acknowledged the important role played by NGOs in the fight against torture. In addition to lobbying for

3

the establishment of United Nations instruments and monitoring mechanisms, they have made a valuable contribution to their enforcement. Individual experts, including the Special Rapporteur on torture and the Special Rapporteur on violence against women, and treaty monitoring bodies such as the Committee against Torture rely heavily on information brought to their attention by NGOs and individuals.

# I.   Pertinent international instruments

## Standard Minimum Rules for the Treatment of Prisoners (1955)

The Standard Minimum Rules for the Treatment of Prisoners were adopted in 1955 by the First United Nations Congress on the Prevention of Crime and the Treatment of Offenders and approved by Economic and Social Council resolutions 663 C (XXIV) of 31 July 1957 and 2076 (LXII) of 13 May 1977.

The Standard Minimum Rules seek "to set out what is generally accepted as being good principle and practice in the treatment of prisoners and the management of institutions". They apply to all categories of detainees, including sentenced prisoners, those under administrative detention and persons detained without charge. On the whole, they represent "the minimum conditions which are accepted as suitable by the United Nations".

The Rules lay down minimum standards for registration; separation and classification of detainees; accommodation; sanitary installations; provision of food, drinking water, articles necessary for personal hygiene, clothing and bedding; religious practice; education; exercise and sport; medical services; and treatment of mentally ill prisoners. They regulate disciplinary and complaints systems, the use of instruments of restraint and the transport of detainees. In particular, all cruel, inhuman or degrading punishments, including corporal punishment, are completely prohibited as punishments for disciplinary offences. There is also a section regulating the qualifications and behaviour of institutional personnel.

In resolution 2858 (XXVI) of 20 December 1971, the General Assembly recommended to Member States that the Standard Minimum Rules should be effectively implemented in the administration of penal and correctional institutions. It invited them to consider incorporating the Rules in their national legislation.

4

### Declaration on the Protection of All Persons from Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (1975)

The Declaration was adopted by General Assembly resolution 3452 (XXX) of 9 December 1975. Article 1 defines torture as:

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted by or at the instigation of a public official on a person for such purposes as obtaining from him or a third person information or confession, punishing him for an act he has committed or is suspected of having committed, or intimidating him or other persons. It does not include pain or suffering arising only from, inherent in or incidental to, lawful sanctions to the extent consistent with the Standard Minimum Rules for the Treatment of Prisoners.

> 2. Torture constitutes an aggravated and deliberate form of cruel, inhuman or degrading treatment or punishment.

Article 3 of the Declaration stipulates that no exceptional circumstances such as a state or a threat of war, internal political instability or any other public emergency may be invoked as a justification of torture or other cruel, inhuman or degrading treatment or punishment.

### Code of Conduct for Law Enforcement Officials (1979)

The Code of Conduct for Law Enforcement Officials was adopted by General Assembly resolution 34/169 of 17 December 1979. It contains guidelines for the use of force, including firearms, and the provision of medical treatment to persons in custody. The term "law enforcement officials" is widely interpreted as including all officers of the law who exercise police powers, especially powers of arrest and detention.

The prohibition of torture in article 5 derives from the Declaration against Torture:

> [n]o law enforcement official may inflict, instigate or tolerate any act of torture or other cruel, inhuman or degrading treatment or punishment, nor may any law enforcement official invoke superior orders or exceptional circumstances such as a state of war or a threat of war, a threat to national security, internal political instability or any other public emergency as a justification of torture or other cruel, inhuman or degrading treatment or punishment.

5

According to the commentary to article 5, the term "cruel, inhuman or degrading treatment or punishment" should be interpreted "so as to extend the widest possible protection against abuses, whether physical or mental".

The Code authorizes law enforcement officials to use force "only when strictly necessary and to the extent required for the performance of their duty" (art. 3). It may thus be used only for the prevention of crime or in effecting or assisting in the lawful arrest of offenders, and its use must be proportionate to the legitimate object to be achieved. Firearms should be used only in the event of armed resistance or jeopardy to the lives of others and only where less extreme measures are not sufficient to apprehend the suspect. Law enforcement officials should fully protect the health of persons in their custody and take immediate action to secure medical attention when required (art. 6).

In 1989 the Economic and Social Council adopted Guidelines for the Effective Implementation of the Code of Conduct for Law Enforcement Officials (resolution 1989/61), in which it urged States, inter alia, to reflect the principles embodied in the Code in national legislation and practice, and to establish effective mechanisms to ensure the internal discipline, external control and supervision of law enforcement officials.

### Basic Principles on the Use of Force and Firearms by Law Enforcement Officials (1990)

The Basic Principles were adopted by the Eighth United Nations Congress on the Prevention of Crime and the Treatment of Offenders in Havana, Cuba, on 7 September 1990. They address the lawful use of force and firearms, the policing of unlawful assemblies and of persons in custody or detention, and reporting and review procedures concerning the use of force and firearms in the line of duty. Principle 7 states that the arbitrary or abusive use of force and firearms by law enforcement officials should be punished as a criminal offence under domestic law. Principle 8 stipulates that exceptional circumstances such as internal political instability or any other public emergency may not be invoked to justify any departure from the principles.

Force and firearms may be used only if other means remain ineffective or without any promise of achieving the intended result (principle 4). Law enforcement officials should act in proportion to the seriousness of the offence and the legitimate object to be achieved. Damage and injury

6

should be minimized, medical assistance rendered to injured persons, and relatives or close friends informed at the earliest possible moment (principle 5).

### Principles of Medical Ethics relevant to the Role of Health Personnel, particularly Physicians, in the Protection of Prisoners and Detainees against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (1982)

The Principles of Medical Ethics were adopted by General Assembly resolution 37/194 of 18 December 1982. In the preamble, the General Assembly expresses alarm "that not infrequently members of the medical profession or other health personnel are engaged in activities which are difficult to reconcile with medical ethics". States, professional associations and other bodies are urged to take measures against any attempt to subject health personnel or members of their families to threats or reprisals for refusing to condone the use of torture or other inhuman or degrading treatment or punishment. On the other hand, health personnel, particularly physicians, should be held accountable for contraventions of medical ethics.

Principle 1 states that health personnel have a duty to protect the physical and mental health of prisoners and detainees and to provide medical treatment of the same quality and standard as is afforded to those who are not detained. Active or passive participation in or support of any form of torture or ill-treatment constitutes a gross contravention of medical ethics (principle 2).

It is also a contravention for health personnel to assist in the interrogation of prisoners or detainees in a manner that may adversely affect their physical or mental health; to certify their fitness for any form of treatment or punishment which may adversely affect their physical or mental health (principle 4); or to participate in the restraining of a prisoner or detainee unless such a procedure is necessary to protect the health or safety of the person concerned, other detainees or guardians, and presents no hazard to the detainee's physical or mental health (principle 5).

7

## Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (1984)

The Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment was adopted by the General Assembly on 10 December 1984 and entered into force on 26 June 1987.

It requires States parties, inter alia, to incorporate the crime of torture in their domestic legislation and to punish acts of torture by appropriate penalties; to undertake a prompt and impartial investigation of any alleged act of torture; to ensure that statements made as a result of torture are not invoked as evidence in proceedings (except against a person accused of torture as evidence that the statement was made); and to establish an enforceable right to fair and adequate compensation and rehabilitation for victims of torture or their dependants.

No exceptional circumstances such as a state of war or a threat of war, internal political instability or any other public emergency may be invoked as a justification for torture. The same applies, in the case of an individual offender, to an order from a superior officer or a public authority.

States parties are prohibited from returning a person to another State where he or she would be at risk of torture (principle of non-refoulement). They must ensure, on the other hand, that an alleged perpetrator of torture present in any territory under their jurisdiction is prosecuted or extradited to another State for the purpose of prosecution.

## Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment (1988)

The Body of Principles, adopted by General Assembly resolution 43/173 of 9 December 1988, specifies the rights of persons under arrest and detention to, inter alia, legal assistance, medical care and access to records of their detention, arrest, interrogation and medical treatment. States should prohibit any act contrary to the Principles, make such acts subject to appropriate sanctions and conduct impartial investigations of complaints (principle 7).

Principle 6 states that: "No person under any form of detention or imprisonment shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment." According to a footnote, the term "cruel, inhuman or degrading treatment or punishment" should be interpreted "so as to extend to the widest possible protection against abuses,

8

whether physical or mental, including the holding of a detained or imprisoned person in conditions which deprive him, temporarily or permanently, of the use of any of his natural senses, such as sight or hearing, or of his awareness of place and the passing of time".

Principle 21 states that no detained person may be subjected to violence, threats or methods of interrogation which impair his or her decision-making capacity or judgement. No detainee may be subjected, even with his or her consent, to medical experimentation that may be detrimental to his or her health (principle 22).

Non-compliance with the Principles in obtaining evidence should be taken into account when determining the admissibility of evidence against a detained person (principle 27).

Detained persons or their legal representatives have the right to lodge a complaint, especially regarding torture or other ill-treatment, with the authorities responsible for the place of the detention and, where necessary, to appropriate authorities vested with reviewing power. Such complaints should be promptly dealt with and replied to without undue delay. No complainant should suffer prejudice for lodging a complaint (principle 33).

Promptly after arrest and after each transfer to another place of detention, members of the detainee's family or other persons of his or her choice should be notified of the place where he or she is being held (principle 16). A proper medical examination should be offered to detained or imprisoned persons as promptly as possible after their admission to the place of detention or imprisonment. Thereafter medical care and treatment should be provided whenever necessary. In all cases, the care and treatment should be provided free of charge (principle 24).

Principle 29 stipulates that places of detention should be visited regularly by qualified and experienced persons appointed by, and responsible to, a competent authority distinct from the authority directly in charge of the place of detention. Detainees should have the right "to communicate freely and in full confidentiality" with the persons concerned.

## Basic Principles for the Treatment of Prisoners (1990)

The Basic Principles for the Treatment of Prisoners were adopted by General Assembly resolution 45/111 of 14 December 1990. Essentially, they require that prisoners should be treated with respect for their inher-

9

ent dignity as human beings. They should not suffer discrimination and their religious beliefs and cultural precepts should be respected. They should have access to cultural and educational activities aimed at full development of the human personality, to meaningful remunerated employment that will facilitate their reintegration into society and to all health services without discrimination. Efforts to abolish solitary confinement are encouraged.

### Rome Statute of the International Criminal Court (1998)

The Rome Statute, which establishes an international tribunal to try perpetrators of genocide, crimes against humanity and war crimes, was adopted by a United Nations Diplomatic Conference of Plenipotentiaries on 17 July 1998.[1]

According to article 7, the systematic or widespread practice of torture and "[o]ther inhumane acts of a similar character intentionally causing great suffering, or serious injury to body or to mental or physical health" constitute crimes against humanity. Torture is defined as "the intentional infliction of severe pain or suffering, whether physical or mental, upon a person in the custody or under the control of the accused; except that torture shall not include pain or suffering arising only from, inherent in or incidental to, lawful sanctions".

### Manual on the Effective Investigation and Documentation of Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (Istanbul Protocol) (1999)

The Manual and the Principles it contains were produced by a coalition of experts representing 40 organizations or institutions. In resolution 55/89, to which the Principles are annexed, the General Assembly strongly encouraged Governments to "reflect upon the Principles as a useful tool in efforts to combat torture" (para. 3).

The Istanbul Protocol describes in detail the steps to be taken by States, investigators and medical experts to ensure the prompt and impartial investigation and documentation of complaints and reports of torture. The investigation should be carried out by competent and impartial experts, who are independent of the suspected perpetrators and the agency they serve (principle 2). They should have access to all necessary information, budgetary resources and technical facilities. They

---

[1] United Nations document A/CONF.183/9.

10

should have the authority to issue summonses to alleged perpetrators and witnesses, and to demand the production of evidence (principle 3(a)). The findings of the investigation should be made public (principle 5(b)). The alleged victims and their legal representatives should have access to any hearing and to all information relevant to the investigation (principle 4).

Principle 3(b) states that: "Alleged victims of torture, witnesses, those conducting the investigation and their families shall be protected from violence, threats of violence or any other form of intimidation that may arise pursuant to the investigation. Those potentially implicated in torture shall be removed from any position of control or power, whether direct or indirect, over complainants, witnesses and their families, as well as those conducting the investigation."

## II.   Treaty monitoring bodies

### Committee against Torture

Pursuant to article 17 of the Convention against Torture, the States parties elect ten experts "of high moral standing and recognized competence in the field of human rights" as members of the Committee against Torture. The Committee holds two regular sessions in April/May and November each year in Geneva.

The Committee's mandate comprises four principal activities: consideration of periodic State party reports (art. 19); undertaking of confidential inquiries in the light of well-founded indications that torture is being systematically practised in the territory of a State party (art. 20); consideration of communications from individuals who claim to be victims of a violation of the Convention (art. 22); and consideration of inter-State complaints (art. 21).[2] Individual and inter-State complaints may be considered only in respect of States parties who have declared that they recognize the Committee's competence to receive and consider such communications. The Committee also submits an annual report on its activities to the States parties and the United Nations General Assembly.

---

[2] Under article 21, States parties may submit communications claiming that another State party is not fulfilling its obligations under the Convention. To date no such complaint has been submitted.

11

## Consideration of State party reports (art. 19)

States parties undertake to submit to the Committee an initial report on the measures they have taken to give effect to the Convention within one year of its entry into force, and to submit supplementary reports every four years on any new measures taken and any other reports requested by the Committee. State party representatives are invited to present the reports, to answer questions and to submit any additional information requested. Having considered the report, the Committee adopts "conclusions and recommendations" under the following headings: positive aspects; factors and difficulties impeding the application of the Convention; subjects of concern; and recommendations. The "conclusions and recommendations" are made public.

In considering State party reports, the Committee takes into account reliable information submitted by non-governmental organizations, representatives of the legal profession and individuals. NGOs may hold an informal meeting with Committee members prior to the consideration of a State party report in order to communicate their concerns about the country in question.

## Confidential inquiries (art. 20)

The Committee may initiate a confidential inquiry under article 20 of the Convention when it receives reliable information indicating that torture is being systematically practised in the territory of a State party unless the State concerned has declared under article 28 that it does not recognize the Committee's competence in that regard.

The Committee considers that torture is practised systematically

> when it is apparent that the torture cases reported have not occurred fortuitously in a particular place or at a particular time, but are seen to be habitual, widespread and deliberate in at least a considerable part of the country in question. Torture may in fact be of a systematic character without resulting from the direct intention of a Government. It may be the consequence of factors which the Government has difficulty in controlling, and its existence may indicate a discrepancy between policy as determined by the central Government and its implementation by the local administration. Inadequate legislation which in practice allows room for the use of torture may also add to the systematic nature of this practice.[3]

---

[3] *Official Records of the General Assembly; Forty-eighth Session; Supplement No. 44* (A/48/44/Add.1), para. 29.

12

When it receives information of the kind referred to in article 20, the Committee invites the State party concerned to cooperate in examining the material. If it feels that the inquiry should include a visit to the State party by one or more of the Committee's members, it seeks the State's consent. During visits, Committee members usually meet relevant government authorities, members of the judiciary and representatives of NGOs, and visit places of detention. The Committee's findings, together with any comments or suggestions that seem appropriate, are transmitted to the State party with a request for information on action taken as a consequence.

After consulting the State party, the Committee may decide to include a summary account of the results of the proceedings in its annual report to the General Assembly.

## Individual complaints procedure (art. 22)

Under article 22, individuals may submit communications alleging violations of one or more provisions of the Convention by a State party that has recognized the Committee's competence to consider such communications (see annex 1, Model communication).

## Admissibility

A communication is considered admissible only if it fulfils the following criteria:

(a)   It is not anonymous and emanates from an individual subject to the jurisdiction of a State party that has recognized the Committee's competence under article 22.

(b)   The individual claims to be a victim of a violation by the State party of provisions of the Convention.

(c)   The communication has been submitted by the victim, his or her relatives, persons expressly authorized by the victim, or, where the victim is unable to submit the communication, other persons who can justify acting on the victim's behalf.

(d)   The communication is not an abuse of the right to submit a communication under article 22 or incompatible with its provisions.

13

(e)    The same matter has not been and is not being examined under another procedure of international investigation or settlement.[4]

(f)    The individual has exhausted all available domestic remedies.[5]

The majority of cases brought before the Committee under article 22 invoke a risk of torture on deportation (art. 3).[6] In that connection, the Committee has adopted a number of decisions interpreting some of the admissibility criteria.[7] It has ruled, for example, with regard to the exhaustion of domestic remedies: that applicants must challenge the legality of the administrative decisions and acts that form part of the determination process in the country concerned; that applicants must pursue the possibility of a legal challenge before the highest judicial body responsible for reviewing asylum cases; and that applicants must file a request for a ministerial waiver on humanitarian and compassionate grounds in States parties where such a statutory remedy exists and apply for judicial review should it be denied.

In some cases, the Committee has taken the view that it has no jurisdiction to review the grounds for determining whether a person is allowed to stay in a country, so long as the State party fulfils its obligations under article 3. It has declared complaints inadmissible in the

---

[4] The Committee has held that the submission of a communication to, and its subsequent consideration by, regional human rights mechanisms such as the European Commission on Human Rights, the European Court of Human Rights, the Inter-American Commission on Human Rights or the Inter-American Court of Human Rights renders an application inadmissible since they are procedures of international investigation or settlement. This does not apply to extra-conventional mechanisms of the Commission on Human Rights, such as the Special Rapporteur on torture or the Special Rapporteur on violence against women.

[5] The Committee will not consider a complaint on its merits unless the petitioner has first submitted the case to the judicial authorities of the State party concerned, using all avenues of recourse. This rule is waived only where domestic proceedings are unreasonably prolonged or unlikely to bring effective relief. Thus, the Committee has considered communications inadmissible where the author stated in a general fashion that national remedies were ineffective without first submitting a complaint to the national authorities or where a judicial investigation of torture allegations had been ordered or was ongoing and there was no indication of an obstruction of justice.

[6] Article 3: (1) No State party shall expel, return ("refouler") or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture.

(2) For the purpose of determining whether there are such grounds, the competent authorities shall take into account all relevant considerations including, where applicable, the existence in the State concerned of a consistent pattern of gross, flagrant or mass violations of human rights.

[7] See also the Committee's General Comment No. 1 (1996) on the implementation of article 3 of the Convention in the context of article 22 (United Nations document HRI/GEN/1/Rev.5).

14

light of article 3 where the original expulsion order was no longer enforceable or where the author had been issued with a certificate allowing him/her to stay in the country temporarily and was in "no immediate danger of expulsion".

## Interim measures of protection

During consideration of the admissibility or merits of a communication (rule 108(9) and rule 110(3) of the rules of procedure), the Committee may request the State party to take steps to avoid possible irreparable damage to the applicant. In cases involving a risk of deportation (art. 3), it may request the State party not to expel the author of a communication while it is still under consideration. A request for the adoption of interim measures does not prejudge the Committee's views on the admissibility or merits of the communication.

## Consideration of the merits

Admissible communications are considered on their merits. Within six months of the admissibility decision, the State party concerned must submit explanations or statements clarifying the case and indicating any steps taken to remedy the situation. Such statements are transmitted to the author of the communication for comment. The Committee's final views on the case are forwarded to the author and the State party. When it finds that the Convention has been violated, the Committee requests the State party to inform it within 90 days of any measures taken to give effect to its views. The Committee's decisions declaring communications inadmissible and its views on admissible communications are published in its annual report.

Reminders are sent to States parties that fail to report within three months on measures taken to remedy a situation that the Committee has found to be a violation of the Convention.

## Other treaty monitoring bodies

A number of other international human rights instruments prohibit torture and other forms of ill-treatment and have established monitoring bodies, composed of independent experts, to review their implementation by States parties. Their methods of work are similar to those of the Committee against Torture. In particular, the Human Rights Committee, the Committee on the Elimination of Discrimination

against Women and the Committee on the Elimination of Racial Discrimination may receive individual complaints in respect of States parties that have recognized their competence to receive and consider such communications. They apply similar criteria of admissibility.

## Human Rights Committee

Article 7 of the 1966 International Covenant on Civil and Political Rights states that: "No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment." Article 10 (1) states that: "All persons deprived of their liberty shall be treated with humanity and with respect for the inherent dignity of the human person."

In its General Comment No. 20 (1992), the Human Rights Committee notes that it is the duty of States parties to afford everyone protection through legislative and other measures against the acts prohibited by article 7, "whether inflicted by people acting in their official capacity, outside their official capacity or in a private capacity". This prohibition extends to corporal punishment, including excessive chastisement ordered as punishment for a crime or as an educative or disciplinary measure. States parties must not expose individuals to the danger of torture or cruel, inhuman or degrading treatment or punishment upon return to another country by way of their extradition, expulsion or refoulement.

## Committee on the Elimination of Discrimination against Women

Although the 1979 Convention on the Elimination of All Forms of Discrimination against Women contains no specific provision prohibiting violence against women, the Committee states, in its General Recommendation No.19 (1992), that gender-based violence constitutes discrimination within the meaning of article 1 of the Convention and that the right under international law not to be subjected to torture or to cruel, inhuman or degrading treatment or punishment is one of the rights impaired or nullified by such violence.[8]

On receipt of a communication under the Optional Protocol to the Convention and before taking a final decision on its merits, the Committee has the option of requesting the States party concerned to take steps to protect the alleged victim or victims from irreparable dam-

---

[8] Ibid.

16

age (art. 5). Such a request for interim measures does not imply a determination on the admissibility or merits of the communication.

## Committee on the Rights of the Child

Article 37 of the 1989 Convention on the Rights of the Child requires States parties to ensure that no child is subjected to torture or other cruel, inhuman or degrading treatment or punishment. Article 19 contains a broader provision for the protection of children from mental and physical abuse:

> States Parties shall take all appropriate legislative, administrative, social and educational measures to protect the child from all forms of physical or mental violence, injury or abuse, neglect or negligent treatment, maltreatment or exploitation, including sexual abuse, while in the care of parent(s), legal guardian(s) or any other person who has the care of the child.

Under article 34 of the Convention, States parties "undertake to protect the child from all forms of sexual exploitation and sexual abuse" and to take all appropriate national, bilateral and multilateral measures to that end.

In September 2000, the Committee devoted a day of general discussion[9] to the issue of State violence suffered by children in the context of "law and public order" concerns and by children living in institutions managed, licensed or supervised by the State. It adopted 36 recommendations to States, the international community and NGOs concerning legislative measures, awareness-raising and training, and monitoring and complaints mechanisms. States parties, for example, were urged to review relevant legislation, including criminal legislation, "to ensure that all forms of violence against children, however light, are prohibited, including the use of torture, or cruel, inhuman or degrading treatment … for punishing or disciplining within the child justice system, or in any other context" (recommendation 8). The Committee recommended that "urgent attention be given to ensuring the establishment and effective functioning of systems to monitor the treatment received by children deprived of a family or alleged or recognized to have infringed penal law" (recommendation 26).

---

[9] In September 2001, the topic for the day of general discussion was "Violence against children within the family and in schools".

17

### Committee on the Elimination of Racial Discrimination

Under article 5 of the 1965 International Convention on the Elimination of All Forms of Racial Discrimination, "States parties undertake to prohibit and to eliminate racial discrimination in all its forms and to guarantee the right of everyone, without distinction as to race, colour, or national or ethnic origin, to equality before the law" in the enjoyment of, inter alia, the right "to security of person and protection by the State against violence or bodily harm, whether inflicted by government officials or by any individual group or institution".

### How to bring information to the attention of the Committees

Any information coming within the scope of the Convention against Torture, the International Covenant on Civil and Political Rights, the Convention on the Rights of the Child or the International Convention on the Elimination of Racial Discrimination should be sent to the following address:

**Chairperson of the Committee against Torture/**
**Human Rights Committee/Committee on the Rights of the Child/**
**Committee on the Elimination of Racial Discrimination**
**c/o Office of the High Commissioner for Human Rights**
**United Nations Office at Geneva**
**1211 Geneva 10**
**Fax.: +41-22-917 9022**
**E-mail address: webadmin.hchr@unog.ch**
**Switchboard number: +41-22-917 9000 or +41-22-917 1234**

Any information coming within the scope of the Convention on the Elimination of All Forms of Discrimination against Women should be sent to the following address:

**Chairperson of the Committee on the Elimination of**
**Discrimination against Women**
**c/o Office of the High Commissioner for Human Rights**
**United Nations Office**
**New York**
**Fax.: +1-212-963-3463**
**E-mail address: daw@un.org**

The annual reports of these and other treaty monitoring bodies, as well as decisions, press releases and other relevant documents are accessible

18

on the OHCHR web site (*www.unhchr.ch*, click on Programme, Conventional Mechanisms, Committee against Torture/Human Rights Committee/Committee on the Rights of the Child/Committee on the Elimination of Racial Discrimination/Committee on the Elimination of Discrimination against Women).

# III.   Special Rapporteurs

## The Special Rapporteur on torture

The United Nations Commission on Human Rights, in resolution 1985/33, decided to appoint a special rapporteur to examine questions relevant to torture, to seek and receive credible and reliable information on such questions and to respond effectively to the information. The Special Rapporteur submits a comprehensive report on his or her activities to the Commission each year, reviewing the occurrence and extent of the practice of torture, and making recommendations to assist Governments in stamping it out. The mandate of the Special Rapporteur covers all countries, irrespective of whether a State has ratified the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.

The mandate comprises three main activities: transmitting communications consisting of urgent appeals and allegation letters (alleged cases of torture) to Governments; undertaking fact-finding missions (country visits) to countries where information suggests that torture may involve more than isolated and sporadic incidents; and submitting annual reports on the Special Rapporteur's activities, mandate and methods of work to the Commission on Human Rights and the General Assembly.

Unlike the treaty monitoring bodies established under international treaties, the Special Rapporteur does not require the exhaustion of domestic remedies to act on individual cases involving a risk of torture ("urgent appeals") or on alleged acts of torture ("allegations"). Moreover, when the facts in question come within the scope of more than one mandate, the Special Rapporteur may decide to approach one or more thematic mechanisms and country rapporteurs with a view to sending joint communications or seeking joint missions.

## Urgent appeals

The Special Rapporteur has developed an "urgent appeal" procedure in order to react promptly to information suggesting that an individual or

19

a group of individuals is at risk of torture or other forms of ill-treatment, often while in detention, at the hands of public officials or other persons acting at their instigation or with their consent or acquiescence. Owing to the time-sensitive nature of such an appeal, the Special Rapporteur transmits a facsimile directly to the Minister for Foreign Affairs of the country concerned, urging the Government in question to ensure the physical and mental integrity of the person(s) concerned but without drawing any conclusions as to the facts.

The Special Rapporteur also takes action when persons are feared to be at risk of torture or other ill-treatment in the form of corporal punishment, the use of means of restraint contrary to pertinent international legal instruments, prolonged incommunicado detention, solitary confinement, "torturous" conditions of detention, the denial of medical treatment and adequate nutrition, imminent deportation to a country where there is a risk of torture or other ill-treatment, and the threatened use or excessive use of force by law enforcement officials (see "Selected issues" below). The Special Rapporteur also transmits urgent appeals concerning the enactment of legislation that will allegedly undermine the international prohibition of torture, for example by providing for impunity for acts of torture.

## Allegations

Allegations of torture received by the Special Rapporteur which do not require him or her to take immediate action are transmitted to Governments in the form of "allegation letters". These letters contain summaries of individual cases of torture received by the Special Rapporteur and, where applicable, include general references to the phenomenon of torture. These general allegations refer to systematic patterns of torture or patterns relating to a specific group of victims or perpetrators, the use of particular methods of torture, detention conditions amounting to ill-treatment, or specific legislation that has an impact on the occurrence of torture. In this context, the Special Rapporteur may address criminal sentencing provisions (e.g. permitting corporal punishment), criminal procedure legislation (e.g. regarding periods of incommunicado detention, interrogation, etc.), legal provisions granting amnesty, and other measures providing for de facto or de jure impunity in violation of the international prohibition of torture.

The Special Rapporteur requests the Government to clarify the substance of the allegations and to forward information on the status of any investigation, the findings of any medical examination, the identity of

20

the persons responsible for the torture, the disciplinary and criminal sanctions imposed on them, and the nature and amount of compensation paid to the victims or their families. The Special Rapporteur also draws the Government's attention to international human rights instruments prohibiting the alleged acts such as the Universal Declaration of Human Rights, the Convention against Torture or Other Cruel, Inhuman or Degrading Treatment or Punishment, the Convention on the Elimination of All Forms of Discrimination against Women and the Standard Minimum Rules for the Treatment of Prisoners.

## Fact-finding missions (country visits)

Country visits enable the Special Rapporteur to obtain firsthand knowledge of the situation as regards torture and other forms of ill-treatment in a particular country with a view to identifying institutional and legislative factors that contribute to such practices and making detailed recommendations to the Government. Although missions are undertaken only at the invitation of a Government, the Special Rapporteur may decide to solicit an invitation. When contemplating such action, the Special Rapporteur takes into account, first and foremost, the number, quality and gravity of the allegations received and the potential impact that the mission may have on the overall human rights situation.

Before a fact-finding mission takes place, the Government is asked to provide the following guarantees to the Special Rapporteur and accompanying United Nations staff: freedom of movement throughout the country; freedom of inquiry, especially in terms of access to all prisons, detention centres and places of interrogation; free contact with central and local authorities of all branches of government; free contact with representatives of NGOs, other private institutions and the media; confidential and unsupervised contacts, where the Special Rapporteur's mandate so requires, with witnesses and other private individuals, including persons deprived of their liberty; and full access to all documentary material relevant to the mandate. The Government is also asked for assurances that no persons, be they officials or private individuals, who have been in contact with the Special Rapporteur in connection with the mandate will suffer threats, harassment or punishment on that account or be subjected to judicial proceedings.

During the mission, the Special Rapporteur meets with government authorities (including the head of the executive), NGOs, representatives of the legal profession, alleged victims of torture and relatives of victims. He or she visits prisons, detention centres and places of interrogation to obtain firsthand knowledge of how the criminal legal process

21

operates, from arrest to enforcement of the sentence. Confidential and unsupervised interviews are conducted with victims of torture, witnesses and other private persons, including those deprived of their liberty. In the mission report, the Special Rapporteur may give an account of individual allegations received. Although the monitoring of conditions of detention are not specifically mentioned in the mandate, they may well be pertinent, especially when they constitute a grave risk to the health or life of detainees (see "Selected issues" below).

In the mission report, the Special Rapporteur outlines legislation of relevance to the prohibition of torture such as provisions making torture a crime and provisions governing arrest and detention. Special attention is paid to periods of incommunicado detention, disciplinary sanctions, access to qualified legal representation and legal aid, bail provisions, witness protection, the admissibility of confessions, the status and independence of medical experts and forensic services, and access of members of civil society to places of detention. Lastly, the Special Rapporteur invites suggestions from both State representatives and NGOs regarding the mission's conclusions and recommendations.

### Reports of the Special Rapporteur

The Special Rapporteur submits annual reports to the Commission on Human Rights and, since 1999, annual interim reports to the General Assembly. The report to the Commission contains summaries of all correspondence transmitted to Governments by the Special Rapporteur ("urgent appeals" and "other allegations") and of correspondence received from Governments. The Special Rapporteur may also include general observations on specific countries. No conclusions as to individual torture allegations are drawn. The report may address specific issues[10] or developments that influence or are conducive to torture in the world, offering general conclusions and recommendations. Mission reports are usually appended to the main Commission report. The interim report to the General Assembly outlines overall trends and recent

---

[10] The following issues have been addressed: the non-derogability of the prohibition of torture (E/CN.4/2002/137); racism and torture (E/CN.4/2001/66); corporal punishment (E/CN.4/1997/7); violation of the prohibition of torture of children (E/CN.4/1996/35); gender-specific forms of torture (E/CN.4/1995/34); the interrelationship between the Special Rapporteur on torture and the Committee against Torture (E/CN.4/1988/17); the role of medical personnel in torture, responsibility for the violation of the prohibition of torture, national standards for correcting and/or preventing torture (E/CN.4/1987/13); types and methods of torture, trade in instruments of torture, torture and violations of other human rights (E/CN.4/1986/15).

22

factual, legal and procedural developments of relevance to the Special Rapporteur's mandate.[11] The Special Rapporteur presents the reports to the annual sessions of the Commission and General Assembly and they are publicly discussed by both Governments and NGOs.

## The Special Rapporteur on violence against women, its causes and consequences

The mandate of the Special Rapporteur on violence against women was created by the Commission on Human Rights in 1994.[12] The first Special Rapporteur structured activities under the mandate according to the substantive breakdown of violence against women contained in the Declaration on the Elimination of Violence against Women:[13] violence against women in the family, violence in the community, and violence perpetrated and condoned by the State. The Declaration defines violence as

> any act of gender-based violence that results in, or is likely to result in, physical, sexual, or psychological harm or suffering to women, including threats of such acts, coercion or arbitrary deprivation of liberty, whether occurring in public or in private life.

According to the Declaration, violence against women encompasses, but is not limited to, physical, sexual and psychological violence:

(a)   That occurs in the family, including battering, sexual abuse of female children in the household, dowry-related violence, marital rape, female genital mutilation and other traditional practices harmful to women, non-spousal violence and violence related to exploitation;

(b)   That occurs in the community, including rape, sexual abuse, sexual harassment and intimidation at work, in educational institutions and elsewhere, trafficking in women and forced prostitution;

---

[11] The following issues have been addressed: intimidation as a form of torture, enforced or involuntary disappearance as a form of torture, torture and discrimination against sexual minorities, torture and impunity, and prevention and transparency (A/56/156); gender-specific forms of torture, torture and children, torture and human rights defenders, reparation for victims of torture, and torture and poverty (A/55/290); incommunicado detention, the Manual on the Effective Investigation and Documentation of Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (Istanbul Protocol) and the Rome Statute of the International Criminal Court (A/54/426).

[12] Resolution 1994/45 entitled "Question of integrating the rights of women into the human rights mechanisms of the United Nations and the elimination of violence against women" adopted without a vote at the 56th meeting on 4 March 1994.

[13] General Assembly resolution 48/104 of 20 December 1993.

(c)   That is perpetrated or condoned by the State, including during times of armed conflict.

The working methods of the Special Rapporteur on violence against women are similar to those of the Special Rapporteur on torture (see above): transmitting urgent appeals and allegations, undertaking fact-finding missions and submitting annual reports to the Commission on Human Rights on a particular category of violence against women.

## Allegations and urgent appeals

With a view to finding durable solutions to the problem of violence against women, the Special Rapporteur has established procedures for obtaining clarifications and information from Governments, in a humanitarian spirit, on allegations of specific cases of violence against women or of general situations conducive to the perpetration of such violence. Urgent appeals concerning an imminent threat, or fear of a threat, to a woman's right to life or personal security may also be sent to the Special Rapporteur.

The Special Rapporteur can only process cases of violence against women that are gender-specific, i.e. violence or threats of violence directed against women because of their gender.[14] When communications are received, the Special Rapporteur first seeks to verify the allegations and then transmits the information to the Government concerned. When transmitting cases to Governments, the Special Rapporteur:

1.   Refers to the applicable international human rights standards, including progressive standards of international law, which are alleged to have been violated.

2.   Urges the competent national authorities to provide the Special Rapporteur with full information on the case concerned with a view to finding a solution or making a recommendation.

3.   May also request the Government concerned to investigate, prosecute, impose appropriate sanctions, provide compensation or rectify a more general situation, in the light of international standards, with a view to preventing the recurrence of particular violations.

---

[14] The definition of gender-based violence used by the Special Rapporteur is taken from the Declaration on the Elimination of Violence against Women.

### Fact-finding missions (country visits)

In country visits the Special Rapporteur has focused on specific forms of violence, including military sexual slavery, trafficking and forced prostitution, rape by non-governmental individuals and domestic violence. This approach has enabled her to undertake a more detailed analysis of the application of international norms to specific forms of violence in a national context, and to make more detailed assessments of the causes and consequences and the effectiveness of certain preventive and remedial initiatives.

## Reports

The Special Rapporteur is required to submit annual reports to the Commission on Human Rights. Mission reports and a report containing summaries of all correspondence transmitted to Governments by the Special Rapporteur ("urgent appeals" and "other allegations") and of correspondence received from Governments are issued as addenda to the Commission report. The reports are presented by the Special Rapporteur during the Commission's annual session in Geneva and are publicly discussed by both Governments and non-governmental organizations.

Each year the Special Rapporteur's annual report surveys a prevalent form of violence against women falling into one of three categories: violence in the family, violence in the community or violence perpetrated or condoned by the State, including armed conflict. The report documents emerging legal standards on the issue, considers future directions and unresolved issues, and presents general reflections on violence against women and the theme in question, including a number of country case studies.

The Special Rapporteur has characterized impunity as the greatest cause of violence against women. Other causes of violence highlighted by the Special Rapporteur are "historically unequal power relations" between men and women, as manifested in economic discrimination and women's subordination in the family; attitudes to women's sexuality which encourage or demand the control of their sexuality; cultural ideologies that justify the subordination of women, including stereotyped gender roles, beliefs that legitimize certain violent practices as expressions of religion, culture or tradition, and negative stereotypes of women in the media; and doctrines of privacy that deter action to eliminate violence against women in the family. The Special Rapporteur has also considered how the interrelationship between gender and other fac-

25

tors such as race, ethnic identity, sexual orientation and class shapes the causes of violence against women.

With regard to violence by private (non-governmental) groups and individuals, the Special Rapporteur has noted that States may be held responsible for such violence under international law if the private acts are covered by the provisions of a treaty (such as the Convention on the Elimination of All Forms of Discrimination against Women); the State is in complicity with those who commit the abuses; or the State denies women the equal protection of the law by failing to enforce criminal law in cases of violence against women on an equal basis with cases of other violent crimes; or if the State fails to exercise due diligence to prevent violations, investigate violations that occur, impose appropriate punishment, and ensure adequate compensation for the victim.[15]

## How to bring information to the attention of the Special Rapporteurs

Any individual, group, non-governmental organization, inter-governmental agency or Government that has knowledge of the occurrence of acts of torture or other forms of ill-treatment (**allegations**), or fears that such ill-treatment may occur or might be occurring (**urgent appeals**) can bring the information to the Special Rapporteurs' attention. The following information regarding individual cases should be transmitted (if available):

(a)   Full name of the victim;

(b)   Date (at least the month and year) on which the incident(s) of torture occurred;

(c)   Place where the person was seized (city, province, etc.) and location at which the torture was carried out (if known);

(d)   Description of the alleged perpetrators of the violation (including position held and/or State affiliation);

(e)   Description of the form of torture used and any injury suffered or statement of reasons to believe that the person is at risk of torture;

---

[15] See also the United Nations Declaration on the Elimination of Violence Against Women, article 4 of which requires States to pursue by all appropriate means and without delay a policy of eliminating violence against women.

(f)   Identity of the person or organization submitting the report (name and address, which will be kept confidential).

The Special Rapporteur on violence against women needs the following information, if available:

(a)   A summary of the main points of the case identifying the rights that have been or may be violated. If the State concerned has ratified human rights treaties, an indication of the provisions of the treaties believed to have been violated.

(b)   If the submission concerns a law, practice or policy that affects women in general or women in a specific group, an explanation of how other women or a specific group of women are affected. A consistent pattern in individual cases can be used to demonstrate a general failure to prevent and respond to private abuses.

If the submission concerns violations by private individuals or groups (rather than government officials), the Special Rapporteur requires any information that might indicate that the Government failed to exercise due diligence to prevent, investigate, punish and ensure compensation for the violations, such as:

(a)   Whether or not there is a law that addresses the violation;

(b)   Any defects in existing laws such as inadequate remedies or definitions of rights;

(c)   Refusal or failure by the authorities to register or investigate the case and other similar cases;

(d)   Failure by the authorities to prosecute the case and other similar cases;

(e)   Patterns of gender discrimination in the prosecution or sentencing of cases;

(f)   Statistics and other data concerning the prevalence of the type of violation described in the submission.

Any information coming within the mandates of the Special Rapporteurs should be sent to the following address:

**Special Rapporteur on torture/on violence against women**
**c/o Office of the High Commissioner for Human Rights**
**United Nations Office at Geneva**
**1211 Geneva 10**

**Fax.: +41-22-917 9006**
**E-mail address: webadmin.hchr@unog.ch**
**Switchboard number: +41-22-917 9000 or +41-22-917 1234**

All the annual reports of the Special Rapporteur on torture, the Special Rapporteur on violence against women, and other thematic and country rapporteurs, as well as their mission reports, resolutions, press releases and other relevant documents are accessible on the OHCHR web site (*www.unhchr.ch*, click on Programme, Extra-Conventional Mechanisms, Thematic Mandates, Special Rapporteur on torture/ Special Rapporteur on violence against women).

## IV.   United Nations Voluntary Fund for Victims of Torture

### Administration of the Fund

The physical and psychological after-effects of torture can be devastating and last for years, affecting not only the victims but also members of their families. Assistance in recovering from the trauma suffered can be obtained from organizations that specialize in assisting victims of torture. In December 1981, the General Assembly established the United Nations Voluntary Fund for Victims of Torture to receive voluntary contributions for distribution to NGOs that provide humanitarian assistance to victims of torture and members of their families. The Fund is administered by the Secretary-General on the advice of a Board of Trustees composed of a Chairman and four members with wide human rights experience, who act in their personal capacity as United Nations experts. The Board is authorized by the General Assembly to promote and solicit contributions. As a rule, it meets annually for 10 working days in May. During the session, the Board adopts recommendations on reports regarding the use of previous grants and on applications for new grants. It also meets, inter alia, with regular donors to the Fund, the Committee against Torture and the Special Rapporteur on torture. The Secretariat of the Fund and the Board are based at the Office of the High Commissioner for Human Rights in Geneva.

### Type of projects and beneficiaries

The Fund partially subsidizes projects providing medical, psychological, social, economic, legal or other forms of humanitarian assistance to torture victims and members of their family. Each year, the Fund

28

finances projects to assist more than 60,000 victims and their family members from all over the world. Subject to the availability of funds, it also subsidizes a limited number of projects to train health professionals and others on how to provide specialized assistance to victims of torture. In May 2001, acting on the Board's recommendations, the Secretary-General approved grants totalling US$8 million to 187 projects in 70 countries.

## Grants from the Fund

A grant from the Fund covers a 12-month period. The budget for a project must reflect real local costs. The sum requested from the Fund should not represent more than one third of the total budget for the project. Grants for training or for a seminar cannot exceed a sum determined by the Board. New applications for the continuation of a project can be submitted and a new grant recommended provided that the Board receives satisfactory narrative and financial reports on the use of the previous grant.

Applications for grants are judged on their merits, which include the number of victims of torture and members of their families to be assisted by a project, the type of torture and after-effects suffered, the type of assistance needed, the professional experience of the project staff in assisting victims of torture, and case studies of victims to be assisted. Confidential information of this kind is made available only to the Board. The number of grants allocated and their amount are not predetermined or subject to equitable geographical distribution. The Board takes into consideration the increasing need to assist small projects for humanitarian assistance to victims of torture, most of which have minimum financial capacity.

## The Fund's cycle

Each year, the secretariat analyses applications for project grants to determine their admissibility. The Board recommends grants for approval by the Secretary-General on the basis of new contributions registered and admissible applications received. Beneficiaries of grants must submit narrative, financial and audit reports on their use.

## Project admissibility and selection criteria

Criteria for admissibility, as well as other selection criteria, are set forth in the Guidelines of the Fund, which are updated regularly. To be

29

admissible, applications for grants must be drafted on the Fund's application form. The Guidelines and forms are accessible in the section of the web site of the Office of the High Commissioner for Human Rights (*www.unhchr.ch*) entitled "Civil Society Support Initiatives" or can be requested from the secretariat of the Fund (see contact numbers below).

## Contributions to the Fund

Since 1983 the Fund has been one of the main international institutions providing grants to NGOs for direct assistance to victims of torture worldwide. Donors are invited to contribute well in advance of the Fund's annual session so that their contribution can be duly registered and used during that year. The Board's practice at its annual session has been to recommend for expenditure all the money available for grants in the Fund. New voluntary contributions are therefore needed every year.

Assistance to victims of torture could be jeopardized if increasing requests to the Fund for assistance are not met on an annual basis. The Fund's support is essential for many organizations worldwide and the increase in requests is expected to continue in the years ahead. The General Assembly, the Commission on Human Rights, the Committee against Torture, the Special Rapporteur on torture, the Secretary-General, the High Commissioner for Human Rights and the Chairman of the Board therefore regularly appeal to Governments, organizations and individuals to contribute annually to the Fund.

Contributions to the Fund can be made: (a) by bank transfer to the "United Nations Geneva General Fund" either in United States dollars (c/o UBS AG, PO Box 2770, CH-1211 Geneva 2, account 240-CO-590-160.1) or in other currencies (c/o UBS AG, at the same address, account 240-CO-590-160.0, Swift address UBSWCHZH12A); or (b) by cheque to the order of "The United Nations" to be sent to The Treasurer, United Nations Office at Geneva, CH-1211 Geneva 10, Switzerland. In all cases, donors are invited to specify "Payee: account CH, United Nations Voluntary Fund for Victims of Torture".

## Reporting on the activities of the Fund

The Secretary-General submits an annual report to the General Assembly indicating contributions paid or pledged and the total amount of grants approved. The report also reproduces all recommendations adopted by the Board and approved by the Secretary-General and contains a list of subsidized projects. To protect victims of torture, mem-

30

bers of their families and the staff of projects financed by the Fund, no other details concerning subsidized projects are provided.

### Documents and contacts at the Fund's secretariat

The guidelines, application and reporting forms, and reports to the General Assembly and the Commission on Human Rights are accessible on the OHCHR web site, which is updated regularly (*http://www.unhchr.ch*/Programmes/ Voluntary or Trust Funds/ United Nations Voluntary Fund for Victims of Torture).

For documentation or any further information on the Fund, please contact the secretariat of the Fund at:

**Trust Funds Unit, Support Services Branch**
**Office of the High Commissioner for Human Rights**
**United Nations Office at Geneva**
**CH-1211 Geneva 10**
**Tel.: 0041-22 917 9315**
**Fax: 0041-22 917 9017**
**E-mail address: unvfvt.hchr@unog.ch**

## V.   Selected issues

### Rape and gender-specific forms of violence

In accordance with international jurisprudence which establishes that rape constitutes a form of torture,[16] both the Special Rapporteur on torture[17] and the Special Rapporteur on violence against women (see above) take action on allegations of rape and sexual assault. The Special Rapporteur on torture can take action on cases of gender-based

---

[16]  In its resolution 1998/38, the Commission on Human Rights invited the Special Rapporteur on Torture "to continue to examine questions concerning torture and other cruel, inhuman or degrading treatment or punishment directed against women and conditions conducive to such torture, to make appropriate recommendations concerning the prevention and redress of gender-specific forms of torture, including through rape, and to exchange views with the Special Rapporteur on violence against women with a view to enhancing further their effectiveness and mutual cooperation" (para. 22).

[17]  In presenting his 1992 report to the Commission on Human Rights, the Special Rapporteur on torture stated that since it was clear that rape or other forms of sexual assault against women in detention were a particularly ignominious violation of the inherent dignity and the right to physical integrity of the human being, they constituted an act of torture (summary record of the twenty-first meeting, United Nations document E/CN.4/1992/SR.21, para. 35).

violence only if it has been exercised by public agents or with their consent or acquiescence.[18] The Special Rapporteur on violence against women considers that cultural practices that involve "severe pain and suffering" (and may be considered "torture-like") such as female genital mutilation, honour killings, Sati and similar cultural practices that brutalize the female body must be eliminated as quickly as possible. International standards that clearly establish the State's duty to eradicate domestic violence have emerged since the 1980s.[19] Custom, tradition and religion cannot be invoked by States parties to defend violence against women in the family or to shield from international scrutiny cultural practices that are violent towards women.[20]

In March 2000 the Human Rights Committee adopted General Comment No. 28 on equality between men and women, paragraph 11 of which requests States parties to assist the Committee in assessing compliance with article 7 on torture and cruel, inhuman or degrading treatment by providing it with information on measures taken to eliminate genital mutilation, to prevent forced abortion and forced sterilization, and to provide women who have become pregnant as a result of rape with access to safe abortions.[21]

## Incommunicado detention

Torture is most frequently practised when a person is held without access to a lawyer, his or her family and relatives or groups from civil society (incommunicado detention). In resolution 1999/32, the Commission on Human Rights reminded all States that "prolonged incommunicado detention may facilitate the perpetration of torture and can in itself constitute a form of cruel, inhuman or degrading treatment" (para. 5). Hence, even in cases where no independent risk of torture exists for a person held in incommunicado detention, the Special Rapporteur on torture considers that action in the form of an urgent appeal may be taken where such detention is prolonged. The Special Rapporteur further believes that prolonged incommunicado detention in a secret or unknown place may amount to torture as described in article 1 of the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.

---

[18] In particular, the Special Rapporteur on torture has addressed the issues of sexual abuse and harassment, virginity testing, forced abortion and forced miscarriage (see documents E/CN.4/1995/34 and A/55/290).

[19] See, in particular, the Declaration on the Elimination of Violence against Women and General Recommendation No. 19 of the Committee on the Elimination of Discrimination against Women.

[20] See United Nations document E/CN.4/2002/83.

[21] United Nations document HRI/GEN/1/Rev.5.

32

## Corporal punishment

Although "lawful sanctions" fall outside the international definition of torture, cruel, inhuman or degrading punishment, including corporal punishment, is considered to be unlawful under international law. Lawful sanctions refer only to penal practices that are widely accepted as legitimate by the international community and are compatible with basic internationally accepted standards. The Commission on Human Rights held in resolution 1998/38 that corporal punishment "can amount to cruel, inhuman or degrading punishment or even to torture".

## Intimidation/threats

In resolution 2001/62, the Commission on Human Rights condemned "all forms of torture, including through intimidation, as described in article 1 of the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment" (para. 2). According to the Special Rapporteur on torture, information on threats and intimidation is often a crucial element in assessing whether a person is at risk of physical torture and other forms of ill-treatment.

In resolution 2001/11, the Commission on Human Rights reiterated its concern at the "continued reports of intimidation and reprisals against private individuals and groups who seek to cooperate with the United Nations and representatives of its human rights bodies", and invited the Secretary-General to submit to it a report containing a compilation and analysis of information on alleged reprisals against such individuals and groups.

## Retaliation against victims, witnesses and any other person acting on behalf of torture victims

The Special Rapporteur on torture also intervenes when measures of retaliation are taken or threatened against victims of torture, their relatives, members of civil society, lawyers working on torture complaints and medical or other experts acting on behalf of torture victims.[22] The

---

[22] In particular, the Special Rapporteur on torture takes into account article 13 of the Convention against Torture and paragraph 2(b) of the Istanbul Protocol (see under "Pertinent international instruments"). Article 13 of the Convention states: "Each State Party shall ensure that any individual who alleges he has been subjected to torture in any territory under its jurisdiction has the right to complain to, and to have his case promptly and impartially examined by, its competent authorities. Steps shall be taken to ensure that the complainant and witnesses are protected against all ill-treatment or intimidation as a consequence of his complaint or any evidence given."

Special Rapporteurs pay particular attention to reprisals against individuals or groups for cooperating with them and request Governments to adopt appropriate and effective measures to protect the persons concerned from any form of intimidation. The Special Rapporteurs may act jointly in this regard with the Special Representative of the Secretary-General on human rights defenders.

## Torture and non-State actors

According to the definition of torture contained in article 1 of the Convention against Torture, an act of "severe pain or suffering" qualifies as torture only if it is inflicted "by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity". Acts of torture or other forms of ill-treatment by members of law enforcement agencies, paramilitary groups, civil defence forces or other forces operating with or tolerated by the Government fall within this definition. The Special Rapporteur on torture considers that State responsibility also arises where national authorities are "unable or unwilling" to provide effective protection from ill-treatment (i.e. fail to prevent or remedy such acts), including ill-treatment by non-State actors.

## Imminent expulsion of persons to a country where they are at risk of torture (refoulement)

An individual or a group of individuals at risk of "imminent" deportation to a country where there are reasonable grounds to believe that an identifiable risk of torture or other ill-treatment exists, and where no other effective national legal recourse, for example with suspensive effect on the deportation, can be relied on by the person(s) at risk of deportation, may use the following mechanisms.[23]

In cases submitted to the Committee against Torture invoking a risk of deportation (allegedly in violation of article 3 of the Convention), the Committee may request the State party concerned to take interim measures, i.e. not to expel the author of the communication while the matter is under consideration. To benefit from the protection afforded under

---

[23] In cases where the "deporting" country is a State party to the European Convention for the Protection of Human Rights and Fundamental Freedoms, applicants may prefer to have recourse to the European Court of Human Rights, which has inherent jurisdiction to request a State party to take effective interim measures such as a stay of deportation.

34

article 3 of the Convention, applicants must show that their expulsion would have the foreseeable consequence of exposing them to a "real and personal" risk of being tortured. The Committee has stressed on several occasions that this protection is absolute, and that considerations of a procedural nature or "the nature of the activities in which the person engaged [are] not a relevant consideration in the taking of a decision in accordance with article 3 of the Convention." The Committee has expressly stated that article 3 applies "irrespective of whether the individual concerned has committed crimes and the seriousness of those crimes".

The Special Rapporteur on torture may urge a Government to refrain from deporting persons to a country where they would be at risk of torture (or to a transit country where they would be at serious risk of further deportation to such a country) unless it obtains unequivocal guarantees that the persons concerned will not be subjected to ill-treatment and establishes a system to monitor their treatment after their return. The Special Rapporteur on torture considers that the deporting State also incurs responsibility where the authorities of the target country are "unable or unwilling" to provide effective protection from ill-treatment by non-State agents. If the urgency of the situation or other stringent factors prevent individuals from submitting their cases to the Committee against Torture, the Special Rapporteur will act on their behalf if they demonstrate that deportation is imminent and that a "serious risk of torture" exists in the target country.

## Conditions of detention

Very severe prison conditions have been held to fall within the mandate of the Special Rapporteur on torture because the pain or suffering they inflict may place them close to the borderline between cruel, inhuman or degrading treatment and torture. They have sometimes been described as falling into a "grey area" between torture and other forms of cruel, inhuman and degrading treatment or punishment owing to lack of evidence of the intentional or purposive element required by the term "torture". In assessing the severity of prison conditions, the Special Rapporteur on torture takes into consideration factors such as: the space at the disposal of detainees; the supply of water and other articles needed for personal hygiene; the provision of adequate clothing and bedding; the quantity and quality of food and drinking water; recreational facilities (including outdoor exercise); admission of visitors; provision of medical assistance; sanitation, heating, lighting and ventilation; the disciplinary regime; the complaints system; and the behaviour of prison personnel.

35

## Denial of medical treatment

The intentional withholding of medical treatment from persons in places of detention or in other State institutions such as orphanages or from persons injured by an act attributable to public officials falls within the mandate of the Special Rapporteur on torture. On receipt of such information, the Special Rapporteur requests prompt and appropriate medical treatment for the persons concerned, invoking, in particular, rules 22, 25 and 26 of the Standard Minimum Rules for the Treatment of Prisoners. Pursuant to rule 22, detainees should have access to at least one qualified medical officer with some knowledge of psychiatry and to a qualified dental officer. Sick prisoners who require specialist treatment should be transferred to specialized institutions or civil hospitals. Rule 25 states that medical officers should daily see all sick prisoners, all who complain of illness, and any prisoner to whom their attention is specially directed, and should report to the director of the institution whenever they consider that a prisoner's physical or mental health has been or will be harmed by continued imprisonment or by any condition of imprisonment. They should regularly inspect and advise the director on the quantity and quality of food, the hygiene and cleanliness of the institution and the prisoners, and observance of the rules concerning physical education (rule 26).

## Methods of restraint

Under international law, the use of methods of restraint is primarily governed by the Standard Minimum Rules for the Treatment of Prisoners. Rule 33 states that instruments of restraint such as handcuffs, chains, irons and straitjackets should never be applied as a punishment and that chains or irons should not be used as restraints. Other instruments of restraint should be used only to prevent escape during a transfer, on medical grounds or as a last resort to prevent prisoners from injuring themselves or others or from damaging property. Rule 34 states that instruments of restraint must not be applied for any longer time than is strictly necessary. The Special Rapporteur on torture may intervene in response to information to the effect that these rules have not been respected.

36

# Annex 1

## Model complaint form

for communications under:

- Optional Protocol to the International Covenant on Civil and Political Rights
- Convention Against Torture, or
- Convention on the Elimination of Racial Discrimination

Please indicate which of the above procedures you are invoking:
………………………………………………………………………………

Date:   ………….

## I.   Information on the author of the complaint:

Name: ………………….     First name(s): ………….………………
Nationality:………………     Date and place of birth: ………………
                                ………………………………………

Address for correspondence on this complaint: ………..……………………

Submitting the communication:
on the author's own behalf:   ………..…………………
on behalf of another person: ………..…………………

[If the complaint is being submitted on behalf of another person:]

Please provide the following personal details of that other person:

Name: ………………………..     First name(s): ………..……………………
Nationality: …………………..     Date and place of birth: ………..………
                                ………………………………………

Address or current whereabouts: ………..…………………………………

If you are acting with the knowledge and consent of that person, please provide that person's authorization for you to bring this complaint: …………

*Or*

If you are not so authorized, please explain the nature of your relationship with that person: …………………… and detail why you consider it appropriate to bring this complaint on his or her behalf: …………..…………

## II.   State concerned/articles violated/domestic remedies

Name of the State that is either a party to the Optional Protocol (in the case of a complaint to the Human Rights Committee) or has made the relevant declaration (in the case of complaints to the Committee Against Torture or the Committee on the Elimination of Racial Discrimination): ……………………

Articles of the Covenant or Convention alleged to have been violated:

……………………………………………………………………………………

*Exhaustion of domestic remedies:*

Steps taken by or on behalf of the alleged victims to obtain redress within the State concerned for the alleged violation - detail which procedures have been pursued, including recourse to the courts and other public authorities, which claims you have made, at which times, and with which outcomes:

……………………..……………………………………………………………

If you have not exhausted these remedies on the ground that their application would be unduly prolonged, that they would not be effective, that they are not available to you, or for any other reason, please explain your reasons in detail:

……………………………………………………………………………………

## III.   Other international procedures

Have you submitted the same matter for examination under another procedure of international investigation or settlement (e.g. the Inter-American Commission on Human Rights, the European Court of Human Rights, or the African Commission on Human and Peoples' Rights)? ………………………

If so, detail which procedure(s) have been, or are being, pursued, which claims you have made, at which times, and with which outcomes:

……………………………………………………………………………………

## IV.   Facts of the complaint

Detail, in chronological order, the facts and circumstances of the alleged violations. Include all matters which may be relevant to the assessment and consideration of your particular case. Please explain how you consider that the facts and circumstances described violate your rights:

……………………………….…………………………………………………………

……………………………….…………………………………………………………

……………………………….…………………………………………………………

*Author's signature:* …………………………………

38

[The blanks under the various sections of this model communication simply indicate where your responses are required. You should take as much space as you need to set out your responses.]

Checklist of supporting documentation (copies, not originals, to be enclosed with your complaint):

Written authorization to act (if you are bringing the complaint on behalf of another person and are not otherwise justifying the absence of specific authorization): ……..

• Decisions of domestic courts and authorities on your claim (a copy of the relevant national legislation is also helpful): ………………………………

• Complaints to and decisions by any other procedure of international investigation or settlement: ………………………………………………………

• Any documentation or other corroborating evidence you possess that substantiates your description in Part IV of the facts of your claim and/or your argument that the facts described amount to a violation of your rights: …………………………………………………………………………

If you do not enclose this information and it needs to be sought specifically from you, or if accompanying documentation is not provided in the working languages of the Secretariat, the consideration of your complaint may be delayed.

# Annex 2

## Complaint Guidelines

for communications under the Optional Protocol to the Convention on the
Elimination of All Forms of Discrimination Against Women

**1.  Information concerning the author(s) of the communication**

- Family name
- First name
- Date and place of birth
- Nationality/citizenship
- Passport/identity card number (if available)
- Sex
- Marital status/children
- Profession
- Ethnic background, religious affiliation, social group (if relevant)
- Present address
- Mailing address for confidential correspondence (if other than present address)
- Fax/telephone/e-mail
- Indicate whether you are submitting the communication as:
    - Alleged victim(s). If there is a group of individuals alleged to be victims, provide basic information about each individual.
    - On behalf of the alleged victim(s). Provide evidence showing the consent of the victim(s), or reasons that justify submitting the communication without such consent.

**2.  Information concerning the alleged victim(s) (if other than the author)**

- Family name
- First name
- Date and place of birth
- Nationality/citizenship
- Passport/identity card number (if available)
- Sex
- Marital status/children
- Profession
- Ethnic background, religious affiliation, social group (if relevant)
- Present address
- Mailing address for confidential correspondence (if other than present address)
- Fax/telephone/e-mail

41

3. **Information on the State party concerned**

   • Name of the State party (country)

4. **Nature of the alleged violation(s)**

   Provide detailed information to substantiate your claim, including:

   • Description of alleged violation(s) and alleged perpetrator(s)
   • Date(s)
   • Place(s)
   • Provisions of the Convention on the Elimination of All Forms of Discrimination against Women that were allegedly violated. If the communication refers to more than one provision, describe each issue separately.

5. **Steps taken to exhaust domestic remedies**

   Describe the action taken to exhaust domestic remedies; for example, attempts to obtain legal, administrative, legislative, policy or programme remedies, including:

   • Type(s) of remedy sought
   • Date(s)
   • Place(s)
   • Who initiated the action
   • Which authority or body was addressed
   • Name of court hearing the case (if any).
   • If domestic remedies have not been exhausted, explain why.

   *Please note*: Enclose copies of all relevant documentation.

6. **Other international procedures**

   Has the same matter already been examined or is it being examined under another procedure of international investigation or settlement? If yes, explain:

   • Type of procedure(s)
   • Date(s)
   • Place(s)
   • Results (if any)

   *Please note*: Enclose copies of all relevant documentation.

7. **Date and signature**

   Date/place: _____

   Signature of author(s) and/or victim(s): _____

8. **List of documents attached (do *not* send originals, only copies)**

42

## Annex 3

### SPECIAL RAPPORTEUR
### OF THE COMMISSION ON HUMAN RIGHTS
### ON TORTURE

**Model questionnaire to be completed by persons alleging torture
or their representatives**

Information on the torture of a person should be transmitted to the Special Rapporteur in written form and sent c/o Office of the High Commissioner for Human Rights, United Nations Office at Geneva, CH-1211 Geneva 10, Switzerland. Although it is important to provide as much detail as possible, the lack of a comprehensive account should not necessarily preclude the submission of reports. However, the Special Rapporteur can only deal with clearly identified individual cases containing the following minimum elements of information:

a.   Full name of the victim;

b.   Date on which the incident(s) of torture occurred (at least as to the month and year);

c.   Place where the person was seized (city, province, etc.) and location at which the torture was carried out (if known);

d.   Indication of the forces carrying out the torture;

e.   Description of the form of torture used and any injury suffered as a result;

f.   Identity of the person or organization submitting the report (name and address, which will be kept confidential).

Additional sheets should be attached where space does not allow for a full rendering of the information requested. Also, copies of any relevant corroborating documents such as medical or police records should be supplied where it is believed that such information may contribute to a fuller account of the incident. Only copies and not originals of such documents should be sent.

I.        **Identity of the person(s) subjected to torture**

A.   Family name _____

B.   First and other names _____

C.   Sex: Male _____          Female _____

D.   Birth date or age _____

43

    E.   Nationality _____
    F.   Occupation _____
    G.   Identity card number (if applicable) _____
    H.   Activities (trade union, political, religious, humanitarian/solidarity, press, etc.) _____
    I.   Residential and/or work address
         _____

**II.   Circumstances surrounding torture**

    A.   Date and place of arrest and subsequent torture _____

    B.   Identity of force(s) carrying out the initial detention and/or torture (police, intelligence services, armed forces, paramilitary, prison officials, other)   _____

    C.   Were any persons such as a lawyer, relatives or friends permitted to see the victim during detention? If so, how long after the arrest?

         _____

         _____

    D.   Describe the methods of torture used

         _____

         _____

    E.   What injuries were sustained as a result of the torture?

         _____

         _____

    F.   What was believed to be the purpose of the torture?

         _____

         _____

    G.   Was the victim examined by a doctor at any point during or after his/her ordeal? If so, when? Was the examination performed by a prison or government doctor?

         _____

         _____

44

H.   Was appropriate treatment received for injuries sustained as a result of the torture?

_____

I.   Was the medical examination performed in a manner which would enable the doctor to detect evidence of injuries sustained as a result of the torture? Were any medical reports or certificates issued? If so, what did the reports reveal?

_____

_____

J.   If the victim died in custody, was an autopsy or forensic examination performed and what were the results?

_____

_____

## III.   Remedial action

Were any domestic remedies pursued by the victim or his/her family or representatives (complaints to the forces responsible, the judiciary, political organs, etc.)? If so, what was the result? _____

## IV.   Information concerning the author of the present report:

A.   Family name
B.   First name
C.   Relationship to victim
D.   Organization represented, if any
E.   Present full address

45

# Annex 4

**CONFIDENTIAL**
**VIOLENCE AGAINST WOMEN**
**INFORMATION FORM**

**INFORMER:** *The name and address of the person/organization submitting the information will remain confidential. Please also mention whether we can contact you for additional information, and if so by what means.*

Name of person/organization: _____

Address: _____

Fax/tel./e-mail: _____

**VICTIM(S):** *Information about the victim(s) including full name, age, sex, residence, professional and/or other activities related to the alleged violation, and any other information helpful in identifying a person (such as passport or identity card number). Please mention whether the victim is willing to have the case transmitted to the Government concerned.*

Name: _____

Address: _____

Date of birth: _____

Nationality: _____

Sex: _____

Occupation: _____

Ethnic background, religious, social group (if relevant): _____

**THE INCIDENT:** *Including dates, place and the harm suffered or to be prevented. If your submission concerns a law or policy rather than a specific incident, summarize the law or policy and the effects of its implementation on women's human rights. Include information about the alleged perpetrators: their names (if known), any relationship they may have to the victims and/or to the Government, and an explanation of the reasons why you believe they are the perpetrators. If you submit information about violations committed by private individuals or groups (rather than government officials), include any information which might indicate that the Government failed to exercise due diligence to prevent, investigate, punish and ensure compensation for the violations. Include information about the steps taken by the victims or their families to obtain remedies, including complaints filed with the police, other officials or independent national human rights institutions. If no complaints have been filed, explain why not. Include information about steps taken by officials to investigate the alleged violation (or threatened violation) and to pre-*

47

*vent similar acts in the future. If a complaint has been filed, include information about the action taken by the authorities, the status of the investigation at the time the communication is submitted and/or how the results of the investigation are inadequate.*

Date: Time: Location/country: _____

Number of assailants: Are the assailant(s) known to the victim? _____

Name of assailant(s): _____

Does the victim have a relationship with the assailant(s)? If so what is the nature of the relationship? _____

Description of the assailant(s) (include any identifying features):

_____

**DESCRIPTION OF THE INCIDENT:**

Does the victim believe she was specifically targeted because of gender? If so, why? _____

Has the incident been reported to the relevant State authorities? If so, which authorities and when? _____

Have the authorities taken any action after the incident? _____

If so, which authorities? _____

What action? _____

When? _____

*Please bring to the attention of the Special Rapporteur any information that becomes available after you have submitted this form. For example, please inform the Special Rapporteur if your human rights concern has been adequately addressed, or of a final outcome has been determined in an investigation or trial, or an action which was planned or threatened has been carried out.*

**PLEASE RETURN TO**
**THE SPECIAL RAPPORTEUR ON VIOLENCE AGAINST WOMEN**
**OHCHR-UNOG, 1211 GENEVA 10, SWITZERLAND**
(Fax: 00 41 22 917 9006, e-mail: csaunders.hchr@unog.ch)

48

**Human Rights Fact Sheets:**

No.   2   *The International Bill of Human Rights* (Rev.1)

No.   3   *Advisory Services and Technical Cooperation in the Field of Human Rights* (Rev.1)

No.   4   *Methods of Combating Torture* (Rev.1)

No.   5   *Programme of Action for the Second Decade to Combat Racism and Racial Discrimination*

No.   6   *Enforced or Involuntary Disappearances* (Rev.2)

No.   7   *Communications Procedures*

No.   8   *World Public Information Campaign for Human Rights*

No.   9   *The Rights of Indigenous People* (Rev.1)

No. 10   *The Rights of the Child* (Rev.1)

No. 11   *Extrajudicial, Summary or Arbitrary Executions* (Rev.1)

No. 12   *The Committee on the Elimination of Racial Discrimination*

No. 13   *International Humanitarian Law and Human Rights*

No. 14   *Contemporary Forms of Slavery*

No. 15   *Civil and Political Rights: The Human Rights Committee*

No. 16   *The Committee on Economic, Social and Cultural Rights* (Rev.1)

No. 17   *The Committee against Torture*

No. 18   *Minority Rights* (Rev.1)

No. 19   *National Institutions for the Promotion and Protection of Human Rights*

No. 20   *Human Rights and Refugees*

No. 21   *The Human Right to Adequate Housing*

No. 22   *Discrimination against Women: The Convention and the Committee*

No. 23   *Harmful Traditional Practices Affecting the Health of Women and Children*

No. 24   *The Rights of Migrant Workers*

No. 25   *Forced Evictions and Human Rights*

No. 26   *The Working Group on Arbitrary Detention*

No. 27   *Seventeen Frequently Asked Questions about United Nations Rapporteurs*

No. 28   *The Impact of Mercenary Activities on the Right of Peoples to Self-Determination*

49

The *Human Rights Fact Sheet* series is published by the Office of the United Nations High Commissioner for Human Rights, United Nations Office at Geneva. It deals with selected questions of human rights that are under active consideration or are of particular interest.

*Human Rights Fact Sheets* are intended to assist an ever-wider audience in better understanding basic human rights, what the United Nations is doing to promote and protect them, and the international machinery available to help realize those rights. *Human Rights Fact Sheets* are free of charge and distributed worldwide. Their reproduction in languages other than the official United Nations languages is encouraged provided no changes are made in the contents and the Office of the United Nations High Commissioner for Human Rights in Geneva is advised by the reproducing organization and given credit as being the source of the material.

Inquiries should be addressed to:

Office of the United Nations High Commissioner for Human Rights
United Nations Office at Geneva
8-14, Avenue de la Paix
1211 Geneva 10, Switzerland

New York Office:
Ofice of the United Nations High Commissioner for Human Rights
United Nations
New York, NY 10017
United States of America

Printed at United Nations, Geneva                          ISSN 1014-5567
GE.02-41783–May 2002–15,875